**\*NOT FOR PUBLICATION**

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

|  |  |  |
|---|---|---|
| PAMELA J. O'BRIEN, | : | |
| | : | |
| Plaintiff, <u>pro se</u>, | : | |
| | : | Civil No. 06-4864 (FLW) |
| v. | : | |
| | : | **OPINION** |
| INTERNATIONAL BUSINESS | : | |
| MACHINES, INC., | : | |
| | : | |
| Defendant. | : | |
| | : | |

**WOLFSON, UNITED STATES DISTRICT JUDGE**:

Presently before the Court is a motion by Defendant, International Business Machines, Inc. ("Defendant" or "IBM"), for Summary Judgment, pursuant to <u>Fed. R. Civ. P.</u> 56, to dismiss <u>pro se</u> Plaintiff Pamela J. O'Brien's ("Plaintiff" or "Ms. O'Brien") employment discrimination Complaint.[1]  For the reasons that follow, Defendant's motion is granted.

## I.    PROCEDURAL HISTORY

On September 1, 2006, Plaintiff filed her Complaint[2] in the Superior Court of New

---

[1] Plaintiff filed a Motion to deny Defendant's Motion for Summary Judgment and to Reopen Discovery on June 21, 2008, and a Motion to Dismiss Defendant's Motion for Summary Judgment on August 11, 2008.  The second motion is the same as the first.  Pursuant to <u>Fed. R. Civ. P.</u> 56(f), Plaintiff requests that the Court deny Defendant's Motion as premature and allow additional discovery.  The Court considers Plaintiff's arguments with her Opposition and denies Plaintiff's request.  <u>See</u> Part IV., <u>infra.</u>

[2] The Court is obligated to construe <u>pro se</u> pleadings liberally.  <u>Haines v. Kerner</u>, 404 U.S. 519, 520 (1972); <u>Dluhos v. Strasberg</u>, 321 F.3d 365, 369 (3d Cir. 2004) ("[The Court will] apply

Jersey, Monmouth County, Law Division alleging that her employer, IBM: (1) wrongfully terminated her employment due to her disability in violation of her rights under the New Jersey Law Against Discrimination ("LAD"), N.J.S.A. 10:5-1, et seq.; (2) did not make proper and reasonable accommodations for Plaintiff's disability as required under the LAD; (3) discriminated against her based on her age and disability; (4) retaliated against her for reporting her accident as a worker's compensation claim in violation of New Jersey Worker's Compensation Law, N.J.S.A. 34:15-1, et seq.; (5) discriminated against Plaintiff in connection with work assignments, changing job descriptions and work assignments; Defendant did not provide Plaintiff with re-education, courses and certification; (6) engaged in and permitted discriminatory behavior in the work place; (7) created a hostile work environment; (8) retaliated against Plaintiff because she complained about the lack of proper and reasonable accommodations for her disability as well as Defendant ignoring Plaintiff's doctor's instructions; (9) violated her right of privacy by releasing documents to a third party (her husband's divorce attorney pursuant to a state court subpoena); and (10) threatened loss of Plaintiff's job if she underwent a surgical procedure.

On October 10, 2006, the case was removed from the Superior Court of New Jersey, to the United States District Court for the District of New Jersey based on diversity of citizenship pursuant to 28 U.S.C. § 1441. Notice of Removal, dated Oct. 10, 2006, at ¶¶ 3-4. Plaintiff resides in New Jersey; Defendant's place of incorporation and principal place of business is New

---

the applicable law, irrespective of whether the pro se litigant has mentioned it by name."). Defendant asserts that "although Plaintiff claims she is appearing pro se, it is clear from her opposition and other recent submissions to the Court that she is being assisted by counsel." Df. Reply at n. 1. Plaintiff denies these allegations, and without more, the Court reviews the motions as having been submitted by Ms. O'Brien, since she is the sole signatory on the papers.

York.  Further, Defendant estimates that Plaintiff's claims are in excess of $75,000.  Thus, the

Court has jurisdiction pursuant to 28 U.S.C. § 1332.  On June 12, 2008, following the close of

discovery, IBM moved for summary judgment on all of Plaintiff's claims.[3]


## II.    FACTS

### A.    Plaintiff's Performance History

Ms. O'Brien was employed by IBM for more than ten years, most recently as a Project

Manager in its ISC Division.  See Df. Mot. ¶ 1; Pl. Opp. ¶ 1.  She worked approximately 60% of

the time from home, but was regularly required to visit various IBM facilities in the New York

and New Jersey area.  See McInerney Cert., Ex. B,  Pamela O'Brien Dep. ("Pl. Dep.") 89:1-16.

IBM evaluates the performance of its employees, typically on an annual basis, by review

of the employees' Personal Business Commitments ("PBC").  The PBCs set forth the goals and

objectives that the employee is to achieve in a given year, and the employee's overall

performance is rated by her manager in accordance with a four step rating system: "1" is

"extraordinary" performance; "2" is "achieved/exceeded commitments"; "3" is "achieved

some/most commitments"; and "4" is unsatisfactory.  See McInerney Cert., Ex. C, O'Brien PBCs

2001-2003 ("Ex. C").[4]  According to Defendant, a rating of "4" typically results in immediate job

_____

[3]Plaintiff filed Motions in limine to exclude the opinions of Leslie Reiser, to exclude
IBM's exhibits labeled A, D, E, F, V, and Z, and to exclude the certification of Sandra J.
Richardson, all of which Defendant relies upon in this motion.  Plaintiff's motions are denied.
See n. 10, 17 & 55, infra.

[4]Plaintiff alleges that IBM changed their evaluations in 2004, and retrofitted old
evaluations into the new scale's standards.  See Pl. Opp. ¶ 2; Letter from Pamela O'Brien, dated
July 31, 2008 ¶ 2.  Plaintiff claims that the old scale rating was from 1 to 5, and on that scale a
rating of 3 or above was considered satisfactory performance and an indication that the employee

action.  See Df. Mot. ¶ 2.

In the first half of 2001, Plaintiff worked as a consultant on an internal project.  See Df.

Mot. ¶ 3; Pl. Opp. ¶ 3.  In the December 19, 2001 corresponding PBC, which was reviewed by

Ms. O'Brien and her manager, Marie-Christine Martin ("Ms. Martin"), Ms. Martin wrote:

> Pam achieved 126.1% of utilization on a target of 70% and received good
> feedback from her peers.  They mentioned that she was dedicated to the project
> and was a good team player, pleasant to worth with.  She also provided good
> mentorship to her PMA. However, her lack of knowledge of the [Strategic
> Outsourcing] business coupled with a need to develop her listening skills limited
> her ability to provide the leadership needed on this project.  In addition, the level
> of analytical skills necessary to re-define [the project] was not demonstrated.
> Finally, Pam provided a high level of energy on this project and was passionate
> and enthusiastic.

Ex. C, D00054.  Ms. Martin assigned Plaintiff a rating of a "3" (achieved some/most

commitments) in this PBC.  See Id.

In August 2001, Plaintiff began working in a project development role under a different

manager, Mike Moran ("Mr. Moran").  Df. Mot. ¶ 4; Pl. Opp. ¶ 4.  In her year-end PBC,

evaluating the remainder of 2001, and completed January 23, 2002, Mr. Moran noted:

> Pam joined our team late in the year, but was able to bring an organization to our team
> that was lacking before.  After an initial learning curve, Pam was able to handle many of
> our [sic] her responsibilities on her own by year-end.  Pam has a very strong personality
> that is very effective in keeping things moving.  At times, however, Pam's strengths make
> it hard for her to see others' points of view, magnifying differences rather than
> ameliorating them.

Ex. C, D00063.  Plaintiff was rated a "3" by Mr. Moran.  See Id.  Plaintiff continued in this same

position through 2002.  Df. Mot. ¶ 5; Pl. Opp. ¶ 5.  According to the PBC assessing Ms.

O'Brien's performance for 2002, completed on February 4, 2003, Mr. Moran stated:

was performing his or her job adequately according to the company's expectations.  See Id.

Pam delivered on most of her commitments in 2002. Her organizational skills brought order to a large number of stakeholders on the Personalization project as she structured meetings and ran them efficiently. . . . Pam continued to struggle somewhat with her team goals. Although she drew praise at times for her handling of her role, she also sometimes drew criticism for her personal interactions. Pam needs to build on her strong organizational skills by adding some subject matter expertise rather than relying so heavily on her teammates. Pam scored some significant achievements in 2002 and is poised to build on them in 2003.

Ex. C, D00046. Mr. Moran assigned a "3" rating to Plaintiff. See Id.

In April 2003, Plaintiff began working in an advisory project management role in the content management organization reporting to Jolene Isdale ("Ms. Isdale"). See Df. Mot. ¶ 6; Pl. Opp. ¶ 6. According to the PBC for 2003, completed January 16, 2004, Plaintiff "took two weeks of formal education classes and distance learning courses to be applied to her new role". Ex. C, D00038.[5] Plaintiff does not dispute that she was able to meet only a portion of the job requirements and that those were achieved with significant assistance. See Df. Mot. ¶ 8. Further, Ms. O'Brien does not dispute that Ms. Isdale was forced to assign one of Plaintiff's peers to perform some of her functions. See Id.

Plaintiff disputes, however, Defendant's contention that, on October 1, 2003, she was reassigned to a less demanding role as a project manager reporting to Susan Kim ("Ms. Kim"), and points to Defendant's own investigation to show that her role was subsequently transferred to Ms. Kim's section as a result of a "mission transfer". Df. Mot. ¶ 9; Pl. Opp. ¶ 6. Plaintiff does not dispute that Ms. Kim noted that Ms. O'Brien

---

[5]Plaintiff, however, alleges that she did not receive adequate formal training. See Part II.D.3., infra. She alleges that "she took advantage of the limited training that was available, but this was insufficient to give her complete subject knowledge despite her repeated requests for additional training to be made available." Pl. Opp. at 34.

struggled to: meet due dates, manage various aspects of her assigned project plan,

maintain accurate documentation and work with others.  See Id.  In November 2003, Ms.

Kim contacted HR regarding Plaintiff's continuing performance issues.[6]  See Id.

 Defendant alleges that Ms. Kim assigned Ms. O'Brien to work with a teammate,

Fran Ramanauskas ("Ms. Ramanauskas") in November 2003.  See Df. Mot. ¶ 10;

McInerney Cert., Ex. A, Reiser's Investigation Report, dated October 12, 2004, ("Ex. A")

at 3.  Although Plaintiff does not specifically dispute the chronology in Defendant's

Statement of Undisputed Facts, in her brief and deposition testimony, Plaintiff claims that

this co-worker assignment was formally made after her accident – in February 2004.  See

Pl. Opp. ¶ 22; Pl. Dep. 182:2-186:10.  She does not, however, expressly dispute that Ms.

Ramanauskas assisted her before the accident.  Defendant alleges that Ms. Ramanauskas

was an experienced project manager adept at maintaining sound financial reports, see Df.

Mot. ¶ 10, but Plaintiff disputes that this collaboration was intended to assist Plaintiff in

acquiring the financial/budget management skills that she was lacking as a project

manager.  Instead Plaintiff alleges that Ms. Ramanauskas was assigned to oversee her

work as part of Ms. Kim's attempt to ridicule and humiliate Ms. O'Brien because she was

having trouble meeting deadlines due to her medical condition and need for

accommodations.  See Pl. Opp. ¶ 22.  Nonetheless, Plaintiff does not dispute that Ms.

Kim also scheduled weekly face-to-face meetings with Ms. Ramanauskas and Plaintiff,

---

 [6]Defendant contends that Mr. Moran and Ms. Isdale had contacted HR regarding Plaintiff, as well, but Plaintiff disputes that her managers, former and current, separately consulted with HR regarding her performance issues between 2001 and 2004, contending that no evidence of these contacts has been produced.

and bi-weekly one-on-one conference calls with Plaintiff to assist her progress, all of which continued through the remainder of Ms. O'Brien's employment with IBM.  Id.

In January 2004, Plaintiff received her PBC for 2003.  See Df. Mot. ¶ 11.  While Ms. Kim delivered the review, Plaintiff does not dispute that the contents of the review were comprised almost entirely of input provided by Ms. Isdale since she had been Ms. O'Brien's manager for most of 2003.  See Id. ¶ 11.  In that assessment, Ms. Kim noted:

> Pam was the business owner for Personalization in 1Q03.  Starting in 2Q03, Pam made a career change to become the Advisory Project Manager for Content Management (CM).  In 4Q03, Pam's role was expanded to include managing the project budget handling SOWs and DOUs for deliverables by working with the User Experience group and the Creative Services team.  Pam managed Content Management project plans and issues by working with both the business and extended teams across ibm.com, IBM Research, UE and Creative Services. . . . Pam is making good progress as the project manager supporting Content Management. . . .  I look forward to continuing to work with Pam and providing guidance as she becomes more familiar with the Project Management roles and responsibilities.

Ex. C, D00038.  Plaintiff was again given a "3" rating.  See Id.

**B.     Plaintiff's Accident & Subsequent Disability Claims**

On February 11, 2004, Plaintiff was required to travel from her home in New Jersey to attend an internal "all hands" meeting in the auditorium at the IBM facility in Somers, New York.  Pl. Dep. 88:19-25; Df. Mot. ¶ 12.  Plaintiff allegedly arrived approximately ninety minutes late for this meeting due to an accident and concomitant traffic delay.  Pl. Dep. 101:2-17.  Plaintiff alleges that because of her late arrival, the meeting had already started and the auditorium was dark.  Id. 89:19-92:17.  As she attempted to take a vacant seat in a row of fixed chairs that were partially occupied, Plaintiff allegedly had to squeeze past occupied seats and she tripped over a computer

7

case in the walkway between the rows of seats, which caused her to fall awkwardly and strike her back on the arm of the chair.  Id. 89:17-91:23.  Plaintiff alleges that immediately thereafter she noticed an intense, excruciating pain on the left side of the lower part of her back.  Id. 94:8-25.  Plaintiff allegedly managed to extricate herself from the row of seating and moved to the back of the auditorium, where she removed her shoes and the pain somewhat subsided.  Id. 96:11-97:10.  Defendant alleges that Plaintiff first provided this different and "far more dramatic version of events" at her deposition in September 2007; she had previously given several different versions and timetables for her back injury to IBM and her physician.  Id. 89:17-94:7; Df. Mot. ¶ 15.[7]

Plaintiff claims that just after the two-to-three-hour presentation, she told her manager, Ms. Kim, of the accident and how she injured herself, but Ms. Kim allegedly

_____

[7]Plaintiff alleges that she sought a consultation with Dr. Gregg R. Foos ("Dr. Foos") at Professional Orthopedics near her home in Monmouth County, New Jersey "as soon as [she] got the appointment" after her injury in New York, Pl. Dep. 105:4-106:15; Df. Mot. ¶ 13, and because Dr. Foos was concerned about weakness in O'Brien's back, he referred her to Dr. Cohen, a spinal surgeon for a specialist opinion.  See Pl. Opp. ¶ 14.  On February 12, 2004, the day after the all-hands meeting in New York and Plaintiff's alleged accident, Ms. O'Brien saw physician Jason Cohen, M.D. ("Dr. Cohen"), for an initial consultation, and told him that "a few weeks ago she bent over and felt a sharp pain in her back and could not get up.  Since that time, she ha[d] experienced discomfort.  She was [originally] evaluated by Dr. Foos who felt there was concern regarding her weakness and she was referred to Dr. Cohen for a spinal consultation."  McInerney Cert., Ex. F, Evaluation Notes of Jason Cohen, M.D., dated Feb. 12, 2004 ("Ex. F").

A month later, however, during a follow-up visit with Dr. Cohen, Plaintiff reported that she had first noticed the onset of her back pain after a prolonged six hour car ride and a lengthy meeting on February 11th.  See McInerney Cert., Ex. G, Evaluation Notes of Jason Cohen, M.D., dated Mar. 18, 2004 ("Ex. G").  Defendant states that this version of events was somewhat consistent with the version Plaintiff told IBM Medical on March 2, 2004, when seeking Workers Compensation and Sickness and Accident Benefits, that she "was at a meeting, sat [for] a long [period of] time and experienced pain in lower back."  McInerney Cert., Ex. H, Workers Compensation Report, dated March 3, 2004 ("Ex. H").

All of these versions differ from her report of an "accident" at work.

was not concerned and said to her "You just have to tough it up.  You know, this meeting

is very important and you seem to be all right."  Id. 98:8-15.  Plaintiff asserts that in light

of Ms. Kim's remarks, she felt she had no choice but to remain for the rest of the meeting

and the dinner.  Id. 98:13-99:2.  Defendant, however, disputes that during Plaintiff's

conversation with Ms. Kim, Plaintiff mentioned any fall or discomfort in her back;

Plaintiff elected to stay for an optional dinner from 6 PM to 9 PM, and then drove home.

See Df. Mot. ¶ 16.  Plaintiff contends that she had to make the 2 hour and 45 minute

return trip by car that night, because unlike many other delegates, hotel accommodations

had not been provided to her.  Id. 99:7-100:1, 101:2-10.  According to Plaintiff, in

subsequent days her pain did not subside and was accompanied by a numbness in her leg

and foot.  Id. 102:9-103:2.

     Plaintiff does not dispute that she had previously scheduled vacation days on

February 12 and 13 to extend the long President's Day weekend to visit her mother in

Massachusetts, and was not scheduled to return to work until February 17, 2004.  See Df.

Mot. ¶ 17.  Plaintiff, however, testified that she never went to Massachusetts because she

could not get out of bed those two days.  Pl. Dep. 128:11-130:6.  Plaintiff also testified

that she tried to work on Wednesday, Thursday and Friday of that week.  Id. 106:16-

107:18.  According to Defendant, on Tuesday, February 17, 2004, Plaintiff sent an email

to Ms. Kim informing her that she was out of the office due to a herniated disc, but did

not mention that the injury was sustained during the Somers meeting or while at work.[8]

---

[8]Ms. O'Brien asserts Ms. Kim was "fully aware of how the injury occurred because the
[she] had told her at the time during the meeting at Somers, NY."  Pl. Opp. ¶ 18.  Ms. O'Brien
also claims that she called Ms. Kim at some point and let her know about her injury.  Pl. Dep.

See Df. Mot. ¶ 18.  Plaintiff admits that she was also out of work on February 18, 2004,[9]

but returned to the office the following day.  See Df. Mot. ¶ 18.

On March 2, 2004, Plaintiff informed IBM Medical of her back injury making a

claim for Workers' Compensation benefits.  See Df. Mot. ¶ 19.  In initiating this claim,

Plaintiff does not dispute that she reported to an IBM nurse that "she was at a meeting, sat

a long time and experienced pain in lower back sitting for a long period of time"; she did

not state that her pain began when she tripped into a chair and hurt her back.  Df. Mot.

_____

110:20-111:5.  Plaintiff testified that she "called in about the accident.  When I called in about
the accident, I don't know and I also told Susan Ms. Kim somehow that I called and made it a
workmen's compensation claim."  Id. 107:19-108:16.

On the other hand, Defendant claims that Ms. Kim first learned about Ms. O'Brien's
injury and worker's compensation claim from IBM's Human Resources Health Services when
she was asked to review/ validate the report Ms. O'Brien submitted in March 2004.  See Ex. A at
5.  Plaintiff complains that although her electronic medical record at IBM notes many of the
events, "a major entry has been added on 14th September 2004 (i.e. one week after the Plaintiff's
termination and six months after the events to which it relates).  The entry has been electronically
added by '867267'", which implies that Ms. Kim did not know that Plaintiff's back injury in
February 2004 was work related.  Pl. Opp. ¶ 17; McInerney Cert., Ex. M, IBM Electronic Folder
for O'Brien ("Ex. M").  Plaintiff complains that IBM has not disclosed "a) What migration
occurred and why it apparently only affected this one entry regarding the details of the Plaintiff's
injury.  Other entries appear to have 'migrated' intact as far back as 1999. b) Why the Plaintiff's
medical records were being reviewed (and amended) one week after her termination on what
were, allegedly purely performance grounds completely unrelated to her medical condition."  Id.
Further, Plaintiff states that no affidavit had been provided to support the accuracy or
completeness of this medical record.  See Id.  The Court does not rely on her medical record here.

The parties, however, do agree that by early March 2004, Ms. Kim was aware of Ms.
O'Brien's injury and how it occurred.  Although the parties dispute the date and manner in which
Ms. Kim learned about how Ms. O'Brien's injury occurred, it is a not material fact and does not
preclude summary judgment here.

[9]Plaintiff's physician provided a note, dated May 20, 2004, stating that Plaintiff "was
excused from work on 2/17/04, 2/18/04 for medical reasons."  McInerney Cert., Ex. J, Dr. Cohen
Physician's Note, dated May 20, 2004 ("Ex. J").  Plaintiff was then certified for paid Sickness &
Accident ("S&A") benefits for those days.  See McInerney Cert., Ex. K, IBM S&A Certificate
("Ex. K").

¶ 23; McInerney Cert., Ex. L, IBM Medical Intake Notes ("Ex. L").  Plaintiff submitted

Dr. Cohen's evaluation along with a Worker's Compensation claim to IBM on March 3,

2004.[10]  See Df. Mot. ¶ 20; McInerney Cert., Ex. I, O'Brien Medical Treatment Report

("Ex. I").  Plaintiff's Workers' Compensation claim was allegedly referred to IBM

Workers' Compensation Insurance carrier, Liberty Mutual Insurance Company ("Liberty

Mutual").  See Df. Mot. ¶ 23; McInerney Cert., Ex. H, Worker's Compensation – First

Report of Injury or Illness ("Ex. H").

Plaintiff also made a claim for Sickness & Accident ("S&A") benefits, which are

a form of short term disability benefits that IBM provides to its employees.  See Df. Mot.

¶ 19.  Plaintiff included Dr. Cohen's completed Medical Treatment Report, dated

February 27, 2004, as required for eligibility under S&A, indicating that Ms. O'Brien had

suffered a back injury on February 11, 2004, but that she was able to perform "sedentary

work"[11] and that she needed a "break from sitting every 30 minutes."  Df. Mot. ¶ 20; Ex.

---

[10]Plaintiff now moves to exclude exhibit "F", which is a copy of Dr. Cohen's notes from his initial evaluation of Plaintiff, on hearsay grounds.  See Ex. F.  Plaintiff fails to articulate why this document is inadmissible hearsay or why she seeks to exclude exhibit "F", but not "G", "O", or "P", which are the rest of her medical records produced by her physician Dr. Cohen and all obtained pursuant to the same subpoena.  There is no basis upon which to exclude these medical records, which were obtained pursuant to a valid court order.  IBM has provided signed statements from Dr. Cohen and Dr. Foos that these records are true and accurate copies of the records requested.  See Supplemental Cert. Of Counsel, Ex. B.  Plaintiff neither disputes that Dr. Cohen treated her for her back issues during this time period nor that she was evaluated on the dates reflected in the physician's records.  Therefore, these medical records meet the criteria of the business records exception to the hearsay doctrine and there is no basis to conclude that there is anything untrustworthy about the medical records produced.  See Fed. R. Evid. 803(6).  Accordingly, the Court finds that Exhibit F is admissible and Plaintiff's motion in limine is denied.

[11]Plaintiff does not dispute that this is all her position requires.  Plaintiff, however, notes that Dr. Cohen stated that the date she was expected to return to full duty was "pending."  Ex. I.

I. Plaintiff's S&A claim was denied by IBM Medical on the grounds that "[Dr. Cohen] indicated she was clear to work with no medical restrictions."  Df. Mot. ¶ 19.  Plaintiff, however, did receive S&A leave for February 17 and 18, 2004 and Defendant paid benefits for those days after it received a note from Dr. Cohen, dated May 20, 2004.  See Id. ¶ 21; Ex. J.

Plaintiff was reevaluated by Dr. Cohen on March 18, 2004.  See Ex. G.  Dr. Cohen noted some improvement, but also noted that Plaintiff should continue the same medically necessary sedentary work; this was communicated to IBM.  See Id.  On May 12, 2004, a Liberty Mutual case manager, Holli Pouncel, allegedly informed IBM that Liberty Mutual was denying Plaintiff's workers compensation claim, because "Plaintiff would not talk to Liberty Mutual and/or provide any medical documentation regarding her back injury."[12]  McInerney Cert., Ex. M, IBM Electronic Folder for O'Brien ("Ex. M").  On May 14, 2004, Liberty Mutual informed Plaintiff that after conducting an investigation of her claim it determined that she did not suffer an occupational injury and that no workers compensation benefits would be paid.  See McInerney Cert., Ex. N, Liberty Mutual Letter, dated May 14, 2004 ("Ex. N").

On May 20, 2004, Dr. Cohen again evaluated Ms. O'Brien, at which time he determined that "since last being seen, she [had] made a dramatic improvement in her left

_____

Plaintiff also notes that Dr. Cohen wrote surgery would require missing work for approximately 4 to 6 weeks.  See Id.

[12]Plaintiff claims that no documentary evidence has been provided to support this fact. Instead, Plaintiff controverts that she was non-cooperative with Liberty Mutual and offers the letter Liberty Mutual sent her, dated May 14, 2004, denying her claim, to show that they completed "a thorough investigation of the above captioned claim."  Pl. Opp. ¶ 20.

leg strength.  She [was] not having any significant pain, just some residual ache in her back and occasional paresthesias in her left leg."  McInerney Cert., Ex. O, Evaluation Notes of Dr. Cohen, MD, dated 5/20/2004 ("Ex. O").  Dr. Cohen directed Ms. O'Brien to "continue with frequent breaks at work, getting up every thirty minutes," to "continue her home exercise program," and to follow-up with him as needed.  See Id.  Dr. Cohen also stated that "if [Plaintiff] gets a recurrence of symptoms, at that point consideration will be give to a surgical decompression."  Id.

Plaintiff alleges that even though she told her manager that she required an accommodation of taking breaks every 30 minutes, nonetheless her "work environment was becoming increasingly difficult."  Pl. Opp. ¶¶ 21-22.  Plaintiff alleges that Ms. Kim was "becoming increasingly frustrated by [her] requests for accommodations due to her medical condition and, in particular, the effect it was having on the deadlines required." Id. ¶ 22.  Ms. O'Brien claims that she did not have back surgery because Ms. Kim allegedly told her that if she had back surgery, she would lose her job.  Pl. Dep. 118:15-120:5.  Further, Plaintiff claims that Ms. Kim began subjecting Plaintiff to ridicule and humiliation in front of her colleagues, including assigning Ms. Ramanauskas to oversee her work, even though this "oversight was not inflicted on any other member of the team. Regardless of their PBC assessments."  Pl. Opp. ¶ 22.  Plaintiff also alleges that Ms. Ramanauskas subjected Ms. O'Brien to "a series of cruel and unkind comments about her inability to operate at full speed because of her medical condition."  Id.

Plaintiff alleges that due to the extreme pressure she suffered in the workplace, she did not feel that she could request any further time off to consult her doctors.  See Pl.

Opp. ¶ 23; Pl. Dep. 136:2-137:19.  However, after she was terminated, she immediately

returned to Mr. Cohen.  See Pl. Opp. ¶ 23.  The next time Plaintiff followed up with Dr.

Cohen was on September 15, 2004.  See McInerney Cert., Ex. P, Evaluation Notes of Dr.

Cohen, MD, dated 9/15/2004 ("Ex. P").  Plaintiff contends that because she was unable to

abide by Dr. Cohen's recommendations and job restrictions, she experienced

deterioration in her condition.  See Pl. Opp. ¶ 23.  Finally, she claims that her job

"restrictions caused by her disability" were the reason for her termination.  Id.

### C.    Defendant's PBC 3x3 Initiative

In April 2004, IBM implemented a job reduction program designed to identify and

terminate the employment of consistently low performers within the ISC Division.  See

Pl. Opp. ¶ 24; Df. Mot. ¶ 28; McInerney Cert., Ex. Q, Management Level Emails re: PBC

3x3 ("Ex. Q").  There was an intense focus by IBM to manage performance and deal with

its "low performers or 'repeat threes'" by the Vice President of HR, Vice President of

Workforce Relations, and other senior IBM employees.  Ex. Q, D02184-88.  This

initiative was termed "PBC 3x3" because the managers were asked to identify as

consistently low performers those employees who had received a rating of "3" or lower

on their annual performance reviews for the past three appraisals and whose performance

had not or was not expected to improve in the current year.  Pl. Opp. ¶ 24; Df. Mot. ¶ 28;

Ex. Q.  Plaintiff does not dispute that, as part of this program, she was identified as a

consistently low performer.  Df. Mot. ¶ 28.  Phyllis Thomas ("Ms. Thomas"), HR Partner

for ISC, worked with Ms. Kim, Plaintiff's first line manager, to determine Ms. O'Brien's

selection into the program and "red" status.  See Ex. Q, D02189-91.  Thereafter, Ms.

Thomas submitted a summary of the PBC 3x3 red and green status employees to Vince Ostrosky ("Mr. Ostrosky"), Vice President of ISC Business Transformation for input and approval.  See Ex. Q, D02185, D02189.

Plaintiff claims that Ms. Kim implied to her that inclusion in the program was automatic if an employee received three successive 3's or below.  Pl. Opp. ¶ 24.  Plaintiff, however, disputes this objective criteria and alleges that "eligible" employees were actually rated "red" or "green" according "to some unknown, subjective criteria," and "[t]here is substantial evidence to suggest that there was significant bias in the selection process against older employees."  Id.

According to Defendant, on June 17, 2004, as part of the PBC 3x3 program, Ms. Kim offered Plaintiff a Separation Allowance Plan ("SAP"), which would require her to end her employment with IBM; if she declined the SAP, and elected to remain with IBM, she would be expected to demonstrate immediate and sustained improvement in her performance.  See Df. Mot. ¶ 29; McInerney Cert., Ex. R, Kim PMC Assessment Email to O'Brien, dated Aug. 4, 2004 ("Ex. R").  Absent such improvement, Ms. O'Brien allegedly would be rated unsatisfactory at the end of 30 days, forfeit the opportunity to accept the SAP, and be placed on a formal Performance Improvement Plan ("PIP").  See Df. Mot. ¶ 29; Ex. R.  Ms. O'Brien was allegedly told that if she did not satisfy the terms of the PIP, her employment would be terminated.  See Df. Mot. ¶ 29; McInerney Cert., Ex. S, IBM Performance Improvement Plan for Pam O'Brien, dated July 19, 2004 ("Ex. S").  Defendant claims that Plaintiff promptly rejected the SAP.  Df. Mot. ¶ 29.

Plaintiff has a different recollection of this June 17, 2004 meeting, and disputes

15

the date and manner in which the SAP was relayed to her.[13]  Ms. O'Brien claims that at

this meeting in June, Ms. Kim did not discuss a SAP, but rather told her that "if she was

to take time off to have surgery then she would [not] have a job to come back to and she

would be better off leaving the company."  Pl. Opp. ¶ 26; Pl. Dep. 189:2-8, 193:8-18.

Plaintiff further testified that Ms. Kim told her that she had shown "very poor judgment"

in reporting the accident at the IBM facility.  Pl. Dep. 114:3-21, 189:17-25.[14]

        Although Defendant asserts that, on June 17, 2004, Ms. Kim informed Ms.

O'Brien that her performance was unsatisfactory and that she was to be placed on a

formal PIP, Plaintiff claims that either July 19 or 21, 2004 was the first time she learned

of this.  See Pl. Opp. ¶ 28; Id. at 26.[15]  Plaintiff rationalizes that she was not told that she

was expected to improve her performance because Ms. Kim had already determined that

she wanted Plaintiff to leave IBM.  See Id. ¶ 28.  In addition, Ms. O'Brien claims that Ms.

Kim told her that if she did not complete the PIP then "she did not know what would

happen."  Pl. Opp. ¶ 27.  Plaintiff admits that in Ms. Kim's email, dated August 4, 2004,

Ms. Kim stated that Ms. O'Brien was given 30 days to decide whether to accept a

severance package, and if she declined she was automatically rated unsatisfactory and put

---

[13]Plaintiff alleges that there is no record of this offer having been made to her, "save a reference in an email from Ms. Kim to the Plaintiff some two months later."  Pl. Opp. ¶ 25.

[14]Ms. O'Brien testified that she thought she was going to have to take time off, she "wasn't sure how long or how much or what the extent was going to be".  Pl. Dep. 112:14-114:2.  Plaintiff now claims from claims that Ms. Kim also told her that she had "a need for Project Managers and that if you (the Plaintiff) can't do it then that's your problem."  Pl. Opp. ¶ 26.

[15]Ms. O'Brien's PIP is dated July 19, 2004 and states it will run for 45 days starting on July 21, 2004 and ending on September 3, 2004.  See Ex. S.

on a 45 day improvement plan.  Id.

Ms. O'Brien's performance allegedly did not improve, she was rated unsatisfactory, and was placed on a formal PIP.  See Df. Mot. ¶ 30; Ex. S.  Ms. Kim told Ms. O'Brien that she had 45 days to meet those objectives, with a target completion date of September 3, 2004.[16]  See Df. Mot. ¶ 30; Ex. S.

**D.  Plaintiff's Open Door Complaint & Defendant's Investigation**

Plaintiff contends that on August 3 and 4, 2004, Ms. Kim unreasonably demanded that Plaintiff sign off on her PBC assessment for the period of January 1, 2004 through July 21, 2004, when the PBC goals for July 21, 2004 through September 3, 2004 were allegedly not going to be set until a meeting in Hawthorne, New York, on August 4, 2004. See Ex. R, D02448, D02449.  Plaintiff alleges that due to Ms. Kim's lack of explanation of the process, she contacted HR and learned that the PBC 3x3 initiative inclusion program was not automatic.  See Id., D02448; Pl. Opp. ¶ 29.  Plaintiff communicated this to Ms. Kim via email on August 4, 2004, and related that she was evaluating her options in signing the PBC.  See Ex. R, D02447-48; Pl. Opp. ¶ 29.

On August 5, 2004, Plaintiff filed an appeal of her 30 day unsatisfactory performance rating and requested that IBM commence an investigation of her complaints under its Open Door policy.  See Pl. Opp. ¶ 30; McInerney Cert., Ex. T, Concern Memo

_____

[16]Plaintiff complains that Defendant has presented variant descriptions regarding PBC procedure, i.e., whether IBM should have made a determination as to the improvement in her performance in 30 or 45 days.  See Pl. Opp. ¶ 22.  Further, Plaintiff argues that Ms. Kim did not formally document this meeting or have Ms. O'Brien acknowledge that an offer had been made as required by IBM.  See Pl. Opp. ¶ 25.  The Court notes that Plaintiff admits that IBM provides its employees a formal mechanism to seek redress for their grievances through IBM's Open Door policy and that Plaintiff availed herself of that process.  See Part II.D., infra.

by Phyllis Helms, dated Aug. 5, 2004 ("Ex. T").  Plaintiff does not dispute that the HR

representative asked Plaintiff "if she had asked for any accommodations that were not

granted and she said no but she does drive 2 hrs to/from work and that doesn't comply

with her doctor's advice that she walk every 30 min."  Df. Mot. ¶ 36; Ex. T.  Plaintiff

does not dispute that at her request, an Open Door investigation was commenced and an

independent internal investigator, Leslie Reiser ("Ms. Reiser"), was assigned to the

matter.[17]   See Df. Mot. ¶ 34; Ex. U, Email from M. Geiger to L. Reiser, dated Aug. 11,

---

[17]Plaintiff moves to exclude the following exhibits related to Ms. Reiser's investigation:
"A", (Ms. Reiser's Investigation Report from Ms. O'Brien's Open Door Complaint); "D",
(copies of Ms. Reiser's notes from her interviews with John Rosado and Michael Moran); "E",
(copies of Ms. Reiser's notes from her interview with Susan Kim); "V", (copies of Ms. Reiser's
notes from her interview with Ms. O'Brien); and "Z", (a memorandum to Richard Hume, Vice
President of Operations and Strategy, regarding Ms. Reiser's investigation findings and
conclusion).  See McInerney Cert., Ex. HH, Cert. of Leslie Reiser ("Ex. HH").  Plaintiff appears
to argue that Ms. Reiser, who authored the Report and supporting documentation, had no
independent knowledge of Plaintiff's work environment and/or performance, and her notes,
report, and memoranda constitute inadmissible hearsay.  See Pl. Motion In Limine to Exclude
IBM's Exhibits [Labeled] A, D, E, F, V & Z ("Pl. Mot. Ex.") at 3.  Plaintiff also argues that the
notes presented in Exhibit V are not merely notes of a meeting with Plaintiff on August 18, 2004,
but contain rebuttals of Plaintiff's claims and references to meetings held after Plaintiff's
termination in September 2004.  Pl. Opp. ¶ 37.  Plaintiff further asserts that these documents are
inherently untrustworthy because the interview notes are not independently certified by the
interviewees, there are no documents to support the opinions of the interviewees, the opinions
expressed by the interviews are contradicted by other documents, and the Report contains
inaccuracies.  See Pl. Mot. Ex. at 3-4.  Plaintiff's arguments go to the weight of the evidence not
their admissibility.
    The Federal Rules of Evidence ("F.R.E.") have long recognized the business records
exception, Rule 803(6), to the hearsay doctrine, which permits the admission of documents
containing hearsay provided that there is a foundation that (1) the declarant in the records has
personal knowledge to make accurate statements; (2) the declarant recorded the statements
contemporaneously with the actions that were the subject of the reports; (3) the declarant made
the record in the ordinary course of business activity; and (4) such records were regularly kept by
the business.  See United States v. Furst, 886 F.2d 558, 571 (3d Cir. 1989).  "[T]he requirements
for qualification as a business record can be met by documentary evidence, affidavits, or
admissions of the parties, i.e., by circumstantial evidence, or by a combination of direct and
circumstantial evidence."  Condus v. Howard Savings Bank, 986 F. Supp. 914, 918 (D.N.J.

2004 (Ex. U").

Plaintiff does not dispute that, on August 19, 2004, Ms. Reiser met with Plaintiff to discuss her Open Door complaints. Df. Mot. ¶ 35. During the meeting and in a subsequent e-mail, dated August 23, 2004, Plaintiff complained that: (a) the objectives set forth in the PIP were not realistic; (b) her unsatisfactory performance rating was not fair; (c) she did not receive appropriate training when assigned to the project management position; and (d) her manager mistreated her and was not sympathetic to her back injury. See Pl. Opp. ¶ 34; McInerney Cert., Ex. V, Ms. Reiser's Interview Notes with Ms. O'Brien ("Ex. V"); Ex. W, Email from P. O'Brien to L. Reiser, dated August 28, 2004 ("Ex. W"). Plaintiff does not dispute that she never made any complaints to either HR or to Reiser that she was denied any accommodation with regard to her alleged back injury. See Df. Mot. ¶ 37; Ex. T; Ex. V; Ex. W. On October 12, 2004, Ms. Reiser's Report was published. Df. Mot. ¶ 59; Ex. A.

Plaintiff does not dispute that in investigating Plaintiff's claims, Ms. Reiser

---

1997).

In this case, Ms. Reiser, the author of Exhibits A, D, E, V, and Z, has submitted a Certification authenticating each document. See Ex. HH ¶¶ 6-9, 14-15. Ms. Reiser has further certified that (1) the documents at issue are a recapitulation of the statements made directly to her by the interviewees during the investigation; (2) she recorded these documents contemporaneously with the time that the statements therein were made; (3) the statements in the documents were recorded in the regular course of an Open Door investigation initiated by Plaintiff pursuant to IBM policy; and (4) these documents were regularly maintained by IBM. See Id. ¶¶ 16-19. Thus, the Court finds that these documents are admissible under the business records exception to the hearsay doctrine. As far as any claims of hearsay within the records, the Court notes that while these documents contain some hearsay, they also contain non-hearsay because some evidence within is not being offered for the truth of the matter, but rather for the effect it had on IBM, and some are admissions by Plaintiff; the Court will apply the evidentiary rules accordingly. With respect to any alleged inaccuracies, at this stage of litigation, the Court considers the disputed facts in the light most favorable to Plaintiff.

19

interviewed a number of IBM employees who had direct knowledge and experience with Plaintiff, Ms. Kim, and/or the reasonableness of the objectives that Plaintiff was asked to meet under the PIP.  Df. Mot. ¶ 38.  Specifically, Reiser interviewed: (a) Ms. Kim; (b) Ms. Isdale; (c) Mr. Moran; (d) Mr. John Rosado, Ms. Kim's former manager and Plaintiff's former second-line manager; (e) Ms. Ramanauskas, a peer project manager of Plaintiff reporting to Ms. Kim; (f) Vivian Giles-Coleman ("Ms. Giles-Coleman"), a certified project manager and peer of Plaintiff; (g) David Leip, Ms. Kim's then-current manager; and (h) Barry Morrow ("Mr. Morrow"), a peer project manager of Plaintiff, who directly reported to Ms. Kim.  Id.

Plaintiff also does not dispute that Ms. Reiser found that Ms. O'Brien was assigned several new positions because of continuing performance issues, which persisted despite changes in her job function and training, and that she was unable to meet the requirements of the new positions to which she was assigned; specifically, management allegedly found that Plaintiff "made inappropriate criticism of the work, provided conflicting priority of assigned work items to stakeholders, sent lengthy and repetitive emails, held redundant meetings, and, despite numerous training sessions, lacked an understanding of important PTT tool functions."[18]  Df. Mot. ¶ 7.

### 1.    Review of PIP Objectives

Ms. Reiser allegedly reviewed the objectives set forth in the PIP with three other project managers: Mr. Morrow, Ms. Ramanauskas, and Ms. Giles-Coleman, as well as

---

[18]Plaintiff does not dispute that Ms. Reiser reported that, according to Plaintiff's former managers, Mr. Moran and Mr. Rosado, Ms. O'Brien "failed miserably as a business consultant." Df. Mot. ¶ 5; Ex. D, Interview Notes of John Rosado and Michael Moran.

managers Ms. Isdale and Ms. Kim.  <u>See</u> Df. Mot. ¶ 39; McInerney Cert., Ex. X,

Peer/Manager PIP Reviews ("Ex. X").[19]  The peer project managers and Ms. Isdale

allegedly all said that the "outlined tasks were typical [project manager] activities and

characterized as 'business as usual.'" Df. Mot. ¶ 40.  Some allegedly observed that the

PIP was extremely detailed, and "Ms. Kim indicated this level of detail was necessary

given Ms. O'Brien's history of being unable to deliver complete, accurate, and timely

work items."  <u>Id.</u>

Ms. Reiser allegedly reviewed the reasonableness of the PIP "in its entirety with

both selected peers and other managers, [with] greater focus and attention . . . on the areas

of the PIP identified by Ms. O'Brien as unfair" and the unanimous opinion was that "the

PIP could reasonably be met by a solid performing project manager, with similar

experience [to Plaintiff], within the requested time frame.  Given the fact that Ms.

O'Brien's projects were more contained, less complex, and with a limited budget, of only

$720K, as compared to the projects and budgets managed by her peers[,] which ranged

between $3M-10M," the objectives were considered reasonable and achievable.  <u>Id.</u>. ¶ 41.

### 2.  Plaintiff's Unsatisfactory Performance Rating

Plaintiff does not dispute that when Ms. Reiser investigated Plaintiff's claim that

her unsatisfactory rating was unfair, Ms. Reiser determined that Plaintiff's rating was

consistent with IBM policy, that the process had been properly explained to Plaintiff at

---

[19]Plaintiff alleges that although IBM has produced documentation allegedly showing the PIP marked up with the comments of these individuals, the handwriting is "clearly that of the same individual throughout.  Indeed, on the top of one page, the name of one individual has been crossed through and another inserted it its place."  Pl. Opp. ¶ 40.

the time she was offered the separation package, and that the unsatisfactory rating was fair and appropriate.  See Id. ¶ 42; Ex. R.  Plaintiff, however, disputes that Exhibit R is sufficient to conclude that the process had been satisfactorily explained to her at the time that she was offered the separation package, because the "evidence" upon which Ms. Reiser relied was an email from Ms. Kim, dated August 4, 2004, nearly two months after the alleged offer was made and the package was supposedly explained.[20]  See Pl. Opp. ¶ 42.

### 3.    Lack of Training for Project Manager Position

Ms. Reiser investigated Plaintiff's claim that she did not receive an appropriate level of coaching, training and guidance from management in her role as project manager. See Df. Mot. ¶ 43; Pl. Opp. ¶ 43.  Plaintiff's managers – Ms. Kim, Ms. Isdale, and Mr. Moran – had each informed Ms. Reiser that Plaintiff received ample training, including two weeks of classroom training upon being made a project manager in 2003.  See Df. Mot. ¶ 44; Ex. C, D00038.  Plaintiff does not dispute that she never made a request for any additional classroom training, and that she also took "a financial and internet course on-line."  Df. Mot. ¶ 44; Ex. V.  Ms. O'Brien also does not dispute that she was encouraged to pursue project management certification through the PMI Institute, and that she was reimbursed for all PMI prep materials, including membership and electronic

---

[20]Plaintiff further denigrates reliance on such evidence because in the same email Ms. Kim claimed that HR had been involved from the beginning, but Ms. Reiser allegedly failed to seek documentation from HR, and IBM has not produced any documentation to substantiate Ms. Kim's claims or Ms. Reiser's conclusions.  See Pl. Opp. ¶ 42.

textbooks.  See Df. Mot. ¶ 45.[21]  Even though she was eligible for the PMI prep course,

Plaintiff does not dispute that she failed to take advantage of this opportunity.  See Id.

Ms. Reiser also found that Plaintiff had completed the required coursework for PMI

certification, but never sat for the exam.  See Id.  Plaintiff does not dispute that in

addition to these formal educational opportunities, she was provided specialized training.

See Id. ¶ 46.  Plaintiff does not dispute that she was assigned to work informally with Ms.

Ramanauskas once a week to reconcile and fix reporting errors and help her improve her

skills.  See Id.  In addition, Plaintiff does not dispute that she met with Ms. Kim for one-

on-one weekly meetings and had bi-weekly conference calls to keep her on track.  See Id.

¶ 47.  Plaintiff does not dispute Ms. Reiser's findings that the educational opportunities

available to her were consistent with the educational opportunities offered to the other

project managers.  See Id. ¶ 48.

### 4.     Treatment by Manager after Alleged Back Injury

Ms. Reiser investigated Ms. O'Brien's claim that she was treated unfairly by her

manager following her back injury, and more specifically, Plaintiff's allegations that Ms.

Kim had harassed and embarrassed her in front of colleagues, showed little sympathy

concerning her back condition, and made her feel that her job would be in jeopardy if she

had surgery.  See Id. ¶ 49; Pl. Opp. ¶ 43; Ex. W.  Defendant asserts that Ms. O'Brien

failed to provide Ms. Reiser with examples of how she was treated unfairly, and failed to

---

[21]Plaintiff, however, testified that she "would [have been] more comfortable with the role that I was [originally] trained to do, and since they had reneged on the agreement to give training for this [new position]" as a project manager. Pl. Dep. 146:21-25. Although Plaintiff testified that they "weren't giving the training they promised," she has not articulated what programs she was denied. Id. 147:9.

identify anything that could not be explained as responsive to her performance.[22]  See Df. Mot. ¶ 49.  To support her claim, Ms. O'Brien provided Ms. Reiser with months worth of emails documenting her exchanges with Ms. Kim.[23]  See Id. ¶ 50.  However, Ms. Reiser determined that none of these documents evidenced malice, threats, or discriminatory comments on the part of Ms. Kim, nor did Ms. Reiser discern any difference in the way that Ms. Kim communicated with Plaintiff prior to, as opposed to after, her back injury.  See Id.

Plaintiff disputes Ms. Kim's representation that Ms. O'Brien had never told her about her back injury or the origin of its occurrence until after Ms. O'Brien filed an accident report seeking Workers' Compensation benefits.[24]  See Id. ¶ 51; Pl. Opp. ¶ 46. In addition, Ms. Kim has denied ever making any comments, either directly or indirectly, that would have led Plaintiff to believe that her job was in jeopardy if she needed to take time off.  See Df. Mot. ¶ 51.

Ms. Reiser also interviewed Plaintiff's previous managers – Mr. Moran and Ms. Isdale – both of whom substantiated the performance issues that had been raised by Ms.

---

[22]Plaintiff, however, in a conclusory manner, alleges that she provided Ms. Reiser with a number of examples of the treatment she had to endure, and also claims that she told Ms. Reiser that she had complained to two further levels of management, namely "Leip and Turner," and no action had been taken.  Pl. Opp. ¶ 43.

[23]Plaintiff alleges that IBM has refused to disclose these emails or turn over Plaintiff's computer to her so that she may put the emails into evidence before the Court.  Pl. Opp. ¶ 45.

[24]Ms. O'Brien alleges that in addition to Ms. Kim being on notice from the date the injury occurred on February 11, 2004, Ms. Kim knew of Ms. O'Brien's injury no later than February 17, 2004, when Plaintiff called Ms. Kim to explain her absence from work.  Pl. Opp. ¶ 46; see n. 8, supra.

Kim.  See Id. ¶ 52.  Thus, Ms. Reiser found that Plaintiff's performance issues had

persisted prior to Ms. Kim's performance management actions.  See Id. ¶ 53.  Ms. Reiser

interviewed Ms. Kim's manager, her peer managers, and her direct reports, and learned

from each of the individuals that Ms. Kim was an experienced management professional,

a skilled project manager, and highly respected.  See Id.  None of these individuals had

observed or were aware of any inappropriate behavior by Ms. Kim toward Ms. O'Brien.

See Id.  On the other hand, when Ms. Reiser asked them about Ms. O'Brien, the

interviewees provided consistently negative feedback; specifically, Ms. Reiser learned

that Plaintiff was considered a poor listener, chronically late, dictatorial, abrasive,

incapable of teaming with others, and having a distorted view of her relative contribution

to the value of the organization.  See Id.  After interviewing eight IBM professionals and

reviewing six months of email correspondence provided by Plaintiff, Ms. Reiser

"concluded that Ms. O'Brien was overwhelmed by the rigors of the [project manager] job

responsibilities, was poorly organized and was chronically late to meetings and

conference calls."  Id. ¶ 55.  Ms. Reiser also found that "time-critical work-related

deliverables were often submitted late, and the overall quality of her work was inferior to

that of her peers and not up to the established standards of a project manager."  Id.  As a

result, Ms. Reiser "concluded Ms. Kim's actions relative to Ms. O'Brien were initiated as

a result of performance and not as a result of any back injury."  Id. ¶ 56.

Ms. O'Brien disputes IBM's statements regarding the adequacy and veracity of

Ms. Reiser's investigation of Plaintiff's Open Door Complaint because: (1) all of Ms.

Reiser's conclusions are based on undocumented and uncertified views of third parties;

(2) many of the parties supposedly interviewed had a direct vested interest in justifying

the actions that led to the termination of Plaintiff; (3) none of the conclusions are based

on any documentary evidence or certified or even verbatim notes of the interviews; (4)

the report wasn't produced until after Plaintiff's termination on October 12, 2004; and (5)

Defendant did not wait for the findings of the report when it terminated Plaintiff.  See Pl.

Opp. ¶ 48.[25]

Plaintiff alleges that IBM's Open Door policy is meant to provide an independent

mechanism for employees to voice concerns and to have any issues reviewed, and serves

as way to deal with employee grievances; "when workers can't get satisfaction from their

immediate managers, they can take the problem up the organizational ladder, to the

chairman of the company if necessary."  Id. ¶ 38.  However, here, Plaintiff disputes that

the investigation was completed correctly or fairly, and alleges that Ms. Reiser's

---

[25]Plaintiff repeatedly complains that IBM has not provided written communications or affidavits to support Ms. Reiser's investigation.  See Pl. Opp. ¶ 41 ("Absolutely no certifications or affidavits produced by IBM to confirm that the views set out by the individuals are correctly attributed to them, or as to why their reported comments are so at odds with the comments recorded during the PBC process."); see Id. ¶ 47 ("Unfortunately it appears it did not occur to Reiser to ask these managers to put their comments in writing or even to certify that she had adequately reflected their views.  IBM has never produced any verification from the managers that these were their views or explaining why their reported views were so far divergent from those recorded in the annual PBCs.").  Moreover, the Court notes that Ms. O'Brien argues that IBM's "evidence" presented in support of its Motion is comprised of many unsubstantiated attacks on her performance and character, and IBM does not include affidavits in support of the veracity of these claims, to show that they were the "complete, unedited opinions of the people concerned and that they represented a true and fair account of events."  Id. at 18.  But, Plaintiff never sought the depositions of these individuals to confront them with the statements they allegedly made to Ms. Reiser.  Finally, the Court does not rely on the hearsay within Ms. Reiser's Report when making legal determinations in this case.  See n. 17, supra.

investigation fell well short of the standards expected by the guidelines.  See Id. ¶ 39.[26]

### E.    Plaintiff's Termination

Defendant alleges that Plaintiff was terminated as part of its job reduction

program to eliminate consistently low performers – the PBC 3x3 initiative.  Plaintiff was

identified as an employee who had received a rating of "3" on her annual reviews on her

last three consecutive PBCs, and Ms. Kim did not expect her performance to improve in

2004.  Plaintiff was placed on a PIP, and on September 8, 2004, Plaintiff was terminated

as a result of her failure to achieve its objectives.[27]  See Df. Mot. ¶ 57; Pl. Opp. ¶ 48.  She

was 58 years of age at the time of termination.  Plaintiff does not dispute that Plaintiff's

position was not filled after her termination by a new employee, but rather she alleges that

her responsibilities were reassigned primarily to Ms. Ramanauskas.  See Pl. Opp. ¶ 49;

Df. Mot. ¶ 58; Ex. Y, IBM's Objections and Responses to Interrogatories, dated Sept. 11,

2007, Int. No. 18 ("Ex. Y").  Plaintiff does not dispute that on October 12, 2004, Ms.

Reiser completed her Open Door Investigation Report, setting forth in detail the specific

complaints raised by Plaintiff, her investigation of those complaints and her findings of

_____

[26]Yet, Plaintiff does not challenge the validity of IBM's Open Door investigative policies or PBCs generally, but rather just their application to her.

[27]In her Opposition, Plaintiff states she was fired on September 4, 2004, Pl. Opp. at 28, and also on September 8, 2004.  Id. ¶ 48.  The actual date of termination is not material on this motion, and the Court will proceed on the basis that Plaintiff was terminated in the beginning of September 2004.

Plaintiff also complains that Ms. Kim summoned her to drive to Hawthorne, New York, in September 2004, on the pretext of discussing a work related issue only to learn that she was being terminated as a result of her failure to fulfill her PIP.  Visibly upset, Plaintiff asked if she could keep her IBM laptop computer, but Ms. Kim "refused and attempted to wrest[le] it from the Plaintiff's grasp.  Plaintiff was eventually forced to hand over the computer before leaving the facility."  Id. ¶ 48.

fact, and concluded that Plaintiff's complaints were without merit.  See Df. Mot. ¶ 59; Ex. Z, Reiser Open Door Memo, dated Nov. 19, 2004.  Plaintiff does not dispute that she was informed of the findings of the Open Door investigation.  See Df. Mot. ¶ 59; McInerney, Cert., Ex. AA, Hume Letter, dated Nov. 19, 2004 ("Ex. AA").

### F.    Employment Records Subpoena

In February 2005, subsequent to Plaintiff's termination, and in the course of Plaintiff's divorce proceedings, the attorney for Plaintiff's husband, Bernard H. Hoffman, Esq. ("Mr. Hoffman"), served IBM with a subpoena requiring the production of documents related to Plaintiff's employment.[28]  Pl. Opp. ¶ 50; Df. Mot. ¶ 60; McInerney Cert., Ex. BB, Hoffman Letter and Subpoena Duces Tecum ("Ex. BB").  Plaintiff's divorce counsel was contemporaneously served with a copy of the letter and subpoena sent to IBM, but her attorney did not object or otherwise move to quash the subpoena.[29]  See Df. Mot. ¶ 61.  IBM produced the requested documents to Mr. Hoffman with the stipulation that the documents were confidential, being produced pursuant to the subpoena, not to be disclosed to third parties, and were to be used solely in connection with the divorce action.  See Df. Mot. ¶ 62; McInerney Cert., Ex. CC, IBM Letter to Hoffman, dated March 9, 2005 ("Ex. CC").  Plaintiff's attorney was contemporaneously provided with a copy of IBM's cover letter as well as the documents produced, and again,

---

[28]Plaintiff attacks the issuance of the subpoena by the presiding court, Monmouth County Superior Court, as discovery in that case had already been concluded.  Pl. Opp. ¶ 50.

[29]Plaintiff alleges that even though Mr. Hoffman was aware that Plaintiff was forced to change her divorce counsel due to cost considerations after her termination from IBM, he nevertheless copied the subpoena to her old attorney and his own client, but not to Plaintiff.  Pl. Opp. ¶ 51.

Plaintiff's counsel did not object to the production.  <u>See</u> <u>Id.</u>  Plaintiff alleges that the first time she learned of the subpoena was when Mr. Hoffman attempted to introduce the material in the divorce proceedings in 2005.  Pl. Opp. ¶ 53.  Plaintiff asserts that IBM's response to the subpoena was "significantly in excess of the material requested, [and] it was factually inaccurate."  <u>Id.</u> ¶ 54.

###   G.   Plaintiff's Subsequent Health Problems

After leaving IBM, Plaintiff allegedly experienced various health problems, including impairment of her vision.  <u>See</u> Df. Mot. ¶ 63.  In November 2005, approximately fourteen months after her employment at IBM ended, Plaintiff suffered a detached retina, and even though she was treated promptly, her vision was irreparably impaired.  <u>See</u> Pl. Dep. 9:3-17; 16:15-19:3.  At her deposition, Plaintiff testified that she experienced central serous retinopathy even while at IBM.  <u>Id.</u> 9:3-24.  IBM has no record of Plaintiff advising it of any problems with her vision.  <u>See</u> Df. Mot. ¶ 65; McInerney Cert., Ex. EE, O'Brien IBM Medical File ("Ex. EE").  Plaintiff allegedly did not make any complaints to either HR or Ms. Reiser during the Open Door Investigation that she was disabled as a result of any vision impairment or that she ever requested an accommodation pertaining to any problems with her vision.  <u>See</u> <u>Id.</u> ¶ 66; Ex. T; Ex. V; Ex. W.  Plaintiff disputes IBM's statement of facts with respect to her current health problems, and alleges that her subsequent health problems are not relevant to this litigation.  Pl. Opp. ¶ 55.  IBM obtained Plaintiff's medical records from her ophthalmologist, but Plaintiff objected to the subpoena and the Honorable John J. Hughes, U.S.M.J. ("Judge Hughes"), ultimately upheld the objection based on Plaintiff's

29

representation that this condition occurred <u>after</u> her employment at IBM and was outside the scope of this litigation.  See <u>Id.</u>  Accordingly, the Court notes that Plaintiff's vision impairment is not relevant to this Motion.


III.    **STANDARD OF REVIEW**

Summary judgment is appropriate where the Court is satisfied that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." <u>Fed. R. Civ. P.</u> 56(c); <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 330 (1986).  A fact is "material only if it might affect the outcome of the suit under the applicable rule of law.  <u>Id.</u>  Disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment.  <u>Id.</u>  The burden of establishing that no "genuine issue" exists is on the party moving for summary judgment.  <u>Celotex</u>, 477 U.S. at 330.  Once the moving party satisfies this initial burden, the non-moving party "must set forth specific facts showing that there is a genuine issue for trial." <u>Fed. R. Civ. P.</u> 56(e).  To do so, the non-moving party must "go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" <u>Celotex Corp.</u>, 477 U.S. at 324.  In other words, the non-moving party must "do more than simply show that there is some metaphysical doubt as to material facts." <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586 (1986); <u>see also</u> <u>Ridgewood Bd. of Ed. v. Stokley</u>, 172 F.3d 238, 252 (3d Cir. 1999).  A genuine issue of material fact is one that will permit a reasonable jury to return a verdict for the non-moving party.  <u>Anderson v. Liberty Lobby</u>,

Inc., 477 U.S. 242, 248 (1986).  In evaluating the evidence, a court must "view the inferences to be drawn from the underlying facts in the light most favorable to the [non-moving] party."  Curley v. Klem, 298 F.3d 271, 276-77 (3d Cir. 2002).

The motion is appropriately granted when that party is entitled to judgment as a matter of law.  Anchorage Assocs. v. Virgin Islands Bd. of Tax Review, 922 F.2d 168, 175 (3d Cir. 1990). Even if a record contains facts that might provide support for a non-movant's position, "the burden is on the [non-movant], not the court, to cull the record and affirmatively identify genuine, material factual issues sufficient to defeat a motion for summary judgment." Morris v. Orman, No. 87-5149, 1989 WL 17549, at *8 (E.D. Pa. Mar. 1, 1989) (citing Childers v. Joseph, 842 F.2d 689 (3d Cir. 1988)); see also Atkinson v. City of Phila., No. 99-1541, 2000 WL 793193, at *5 n. 8 (E.D. Pa. June 20, 2000).

## IV.   Plaintiff's Cross-Motion for Summary Judgment

Plaintiff filed a motion, pursuant to Fed. R. Civ. P. 56(f), to deny Defendant's Motion for Summary Judgment and reopen the period of discovery to compel Defendant "to provide a full and complete response to the Plaintiff's Second and Third Requests for the production of documents and to provide a full and complete response to the Plaintiff's First and Second Set of Interrogatories."

Plaintiff concedes that she repeatedly complained that IBM's responses were insufficient throughout the discovery period and that she was granted an extension by Judge Hughes to further attempt to obtain the information she sought.  In what appears to be Plaintiff's latest attempt to request additional documents, she raises substantially the

same issues that have already been considered and denied several times by Judge Hughes. See Hughes's Order, dated May 22, 2008 (denying Plaintiff's Motion to Compel); Hughes's Order, dated July 7, 2008 (denying Plaintiff's Motion for Reconsideration of the May 22, 2008 Order); Hughes's Order, dated Sept. 22, 2008 (denying Plaintiff's Motion to Compel Disclosure as moot). In denying Plaintiff's motion to compel discovery, Judge Hughes explained that even though "Plaintiff stated during the conference call on May 21, 2008 that she knew the discovery was deficient in September of 2007", she did not bring her motion until two or three days prior to the close of discovery on May 2, 2008. Hughes's Order, dated May 22, 2008 (denying Plaintiff's Motion to Compel).

Further, Judge Hughes had already granted Plaintiff additional time for discovery based upon her request at the April 4, 2008 conference, at which time Plaintiff "never indicated that she also wanted to file a motion to compel discovery that was produced and was allegedly deficient in September of 2007." Id. Because Plaintiff admittedly knew that discovery was deficient, Judge Hughes determined that there was no showing of "good cause" to reopen discovery, or to further extend a previously extended discovery period. Id. Judge Hughes then denied Plaintiff's motion for reconsideration without prejudice to her right to file a Rule 56(f) statement in response to a motion for summary judgment. See Hughes' Order, dated July 7, 2008 (denying Plaintiff's Motion for Reconsideration of the May 22, 2008 Order). Thereafter, on September 22, 2008, Judge Hughes denied Plaintiff's Motion to Compel Disclosure, filed on August 11, 2008, as moot. See Hughes' Order, dated Sept. 22, 2008. Plaintiff did not appeal any of Judge

Hughes's Orders.[30]

Plaintiff alleges additional discovery is required, pursuant to Rule 56(f), because affidavits are unavailable, which prevent her from presenting facts that are essential to justify her opposition.  Rule 56(f) permits the Court to order a continuance of a motion for summary judgment "[s]hould it appear from the affidavits of a party opposing the motion that he cannot for reasons stated present by affidavit facts essential to justify his opposition."  Celotex Corp. v. Catrett, 477 U.S. 317, 326 (1986) (citing  Fed. R. Civ. P. 56(f)).  "To succeed, a Rule 56(f) motion must identify with specificity what particular information is sought; how, if uncovered, it would preclude summary judgment; and why it has not previously been obtained."  Espinosa v. County of Union, 212 Fed. Appx. 146, 158 (3d Cir. 2007) (internal quotations and citations omitted).

In support of her allegation that affidavits are unavailable, Plaintiff argues at length that Defendant has failed to respond to her repeated discovery requests in bad faith.  She argues that Defendant objected to 14 out of 24 requests in her First Set of Interrogatories and 39 out of 55 requests in her Second Set of Interrogatories.[31]  Ms.

---

[30]Even if Plaintiff had appealed Judge Hughes's discovery Orders, the Court does not see any abuse of discretion on Judge Hughes's part and Plaintiff's appeal would have likely been denied.  See Port Auth. v. Affiliated FM Ins. Co., No. 91-2907, 2001 U.S. Dist. LEXIS 7579 (D.N.J. Mar. 29, 2001) (explaining that when the standard of review on appeal of a matter within the broad discretion of the magistrate judge, such as a discovery dispute, an abuse of discretion standard is applied).

[31]Defendant directs the Court to the Pretrial Scheduling Order, entered on April 4, 2007, where the parties were limited to 25 interrogatories, including subparts.  See McInerney Cert. ¶ 4. Further, Defendant asserts that even though it noted its objection to the number of Plaintiff's document requests, it responded to each of the 55 requests, either by producing documents or stating that documents responsive to the request do not exist.  See Id. ¶ 14.

O'Brien claims that IBM refuses to cooperate and "release the true Business Records" of the events, Plaintiff's own records from her IBM Thinkpad computer and the two 5-inch binders she allegedly submitted to IBM as part of the Open Door investigation, and IBM's management and executive procedure manuals, which state its procedure and policies for employees who are injured or become disabled.  Pl. Reply to Rul 56(f) Mot. at 9-10.  Plaintiff alleges that these documents, specifically, Plaintiff's Thinkpad and computer files, files supplied pursuant to the Open Door policy, Plaintiff's full HR record (from 1994 through 2004), PBC 3x3 procedure, and Plaintiff's IBM health records, will enable her to show that Ms. Kim was discriminatory in tone in emails, that no action was taken by senior managers with respect to her complaints, that her previous job assignments were not due to her performance issues and she had performed significantly above reasonable expectations throughout her career at IBM, that the PIP was a "pretext and sham," that non-objective criteria were used, that there was an age bias, that Plaintiff was not properly notified about the program, and that IBM altered her past health records after it decided to terminate her.  Id. at 11-12.

Plaintiff's request for additional discovery is not for additional affidavits as she initially indicated.  Rather, Plaintiff simply seeks additional documents, which she never pursued during the discovery period.  Moreover, Ms. O'Brien fails to identify with specificity how this additional evidence would preclude summary judgment, and why it has not previously been obtained.  See Espinosa, 212 Fed. Appx. at 158.  Indeed, Judges Hughes noted Plaintiff's failure to timely move to compel discovery, and that an extension of discovery was given at Plaintiff's request. Accordingly, the Court denies

Plaintiff's request for additional discovery pursuant to Rule 56(f).

## V.      DISCUSSION

Plaintiff's allegations, based on her disabling injury and age of fifty-eight at termination, are related primarily to wrongful termination, discrimination, hostile work environment, failure to accommodate, and retaliation under the LAD[32].  Plaintiff also brings a claim of retaliation in violation of the New Jersey Worker's Compensation Law and a common law privacy violation.  The Court will address each of Plaintiff's claims in turn.

### A.      Plaintiff's Wrongful Termination Claim

Ms. O'Brien claims that she was wrongfully terminated because of her disability, a back problem, in violation of the LAD.  She also asserts that IBM has not presented evidence that her performance was substandard and she claims that the documented evidence from her PBC appraisals show the contrary.  Plaintiff therefore argues that IBM's claim that her termination was due to the PBC 3x3 initiative, designed to eliminate consistently low performers, was a pretext for its discriminatory action.

---

[32]The New Jersey Law Against Discrimination prohibits:

> an employer, because of the race, creed, color, national origin, ancestry, age, marital status, civil union status, domestic partnership status, affectional or sexual orientation, genetic information, sex, . . . disability . . . to refuse to hire or employ or to bar or to discharge or require to retire . . . from employment such individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment . . . .

N.J.S.A. § 10:5-12 (2008).

Defendant argues that Ms. O'Brien cannot demonstrate the elements of a <u>prima</u> <u>facie</u> claim for wrongful termination on the basis of disability discrimination because she cannot show that she met IBM's performance expectations or that IBM replaced her. Alternatively, if Plaintiff does establish the <u>prima facie</u> elements, Defendant argues, she fails to show that the PBC 3x3 was a pretext for discrimination.

New Jersey has adopted the framework of <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792 (1973),[33] as the starting point in actions brought under the LAD.  <u>Andersen</u> <u>v. Exxon Co., U.S.A.</u>, 89 N.J. 483, 492 (1982).  Though the <u>McDonnell Douglas</u> analysis is followed in cases of discriminatory discharge, the elements of the <u>prima facie</u> case are modified slightly to fit the circumstances.  <u>Bell v. KA Indus. Services, LLC</u>, 567 F. Supp. 2d 701, 706 (D.N.J. July 25, 2008); <u>Clowes v. Terminix Int'l., Inc.</u>, 109 N.J. 575, 596 (1988).  In order for a plaintiff to establish a <u>prima facie</u> case of discriminatory discharge because of a handicap or disability, she must establish that: (1) she is disabled or perceived to have a disability[34]; (2) the complainant had been performing his or her work

---

[33]Under <u>McDonnell Douglas</u>, a plaintiff claiming unlawful discrimination must establish, by a preponderance of the evidence, a four-part <u>prima facie</u> case: (1) he belongs to a protected class; (2) he applied and was qualified for the position for which the employer was seeking applicants; (3) he was rejected despite adequate qualifications; and (4) after rejection the position remained open and the employer continued to seek applications for persons of plaintiff's qualifications. <u>Andersen v. Exxon Co., U.S.A.</u>, 89 N.J. 483, 492 (1982).  Once a plaintiff has established the prima facie case, the burden of proof shifts to the employer who may rebut the presumption of discrimination by providing a legitimate, non-discriminatory reason for the rejection.  <u>Id.</u> at 491.  Then, the plaintiff may "prove by a preponderance of the evidence that the legitimate nondiscriminatory reason articulated by the defendant was not the true reason for the employment decision but was merely a pretext for discrimination."  <u>Id.</u>

[34]The LAD refers to "handicap", but defines handicap as a disability.  Courts have generally use the terms interchangeably in this context.  <u>See State v. Dixon</u>, 396 N.J. Super. 329, 339 (App. Div. 2007); <u>Soules v. Mount Holiness Memorial Park</u>, 354 N.J. Super. 569, 575 (App.

at a level that met the employer's legitimate expectations; (3) she was fired; and (4) the employer had sought another to perform the same work after complainant had been removed from the position.  Maher v. New Jersey Transit Rail Operations, Inc., 125 N.J. 455, 481 (1991); Jansen v. Food Circus Supermarkets, 110 N.J. 363, 382 (1988).

Once the employee has satisfied her burden of establishing a prima facie case of discrimination under the LAD, the burden of production then shifts to the employer to rebut the prima facie case by "articulat(ing) some legitimate, nondiscriminatory reason" for its alleged unlawful action.  Clowes v. Terminix Int'l, Inc., 109 N.J. 575, 596 (1988); see also Laresca v. AT&T, 161 F. Supp. 2d 323, 335 (D.N.J. 2001).  "In order to defeat a summary judgment motion if the employer answers the plaintiff's prima facie case with [a] legitimate, nondiscriminatory reason[] for its action, the plaintiff must point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action."  Laresca, 161 F. Supp. 2d at 335-336; Sheridan v. E.I. DuPont de Nemours & Co., 100 F.3d 1061, 1067 (3rd Cir. 1996).  In summary, when evaluating a plaintiff's discrimination claim, the Court engages in the following three step process:

> (1) whether the plaintiff establishes a prima facie discrimination case;
>
> (2) if so, the burden of production, not persuasion, shifts to the defendant to show a non-discriminatory reason for the decision;
>
> (3) if the defendant meets this requirement, the plaintiff must show by a preponderance of the evidence that the non-discriminatory

Div. 2002).

reason was pretext for discrimination.

<u>McDonough v. Cooksey</u>, No. 05-00135, 2007 WL 1456202, at *3 (D.N.J. 2007)[35] (citing

<u>Jones v. Sch. Dist. of Phila.</u>, 198 F.3d 403, 410 (3d Cir. 1999) (citing <u>McDonnell Douglas Corp. v.</u>

<u>Green</u>, 411 U.S. 792, 802 (1973); <u>Tex. Dep't of Cmty Affairs v. Burdine</u>, 450 U.S. 248, 252-53

(1981)).

### 1.    Plaintiff's Prima Facie Case

IBM challenges Ms. O'Brien's <u>prima</u> <u>facie</u> case of unlawful discrimination based on the

second and fourth prongs, specifically, IBM argues that she cannot show her work performance

met IBM's legitimate expectations or that IBM sought another to perform the same work after

her termination.[36]  First, Plaintiff argues that she was performing adequately because: (1)

throughout her ten years of employment, she consistently exceeded both utilization and income

targets; (2) she consistently received good or satisfactory performance ratings; (3) in her last

three performance evaluations, which IBM asserts as the basis for her termination, neither her

three direct line managers nor the three reviewing managers made any mention of serious

concerns or performance issues; (4) far from her role being diminished, in the final quarter of

2003, two months before her accident and nine months before her termination, her role was

significantly expanded; (5) her area of work was considered so important to IBM that it resorted

---

[35]In <u>McDonough</u>, the plaintiff claimed violations under Title VII and the LAD.  However, the <u>McDonough</u> court's interpretation of Title VII discrimination violations is applicable to the LAD discrimination violations.  <u>McDonough</u>, 2007 WL 1456202 at n. 2.  In fact, the New Jersey "Supreme Court has noted that, in construing the LAD, federal precedent governing Title VII is 'a key source of interpretive authority.'"  <u>Woods-Pirozzi v. Nabisco Foods</u>, 290 N.J. Super. 252, 268 (App. Div. 1996) (quoting <u>Lehmann v. Toys 'R' Us, Inc.</u>, 132 N.J. 587, 600-01 (1993)).

[36]Plaintiff's alleged disability of a herniated disc has not been challenged by Defendant in its pending Motion, and both parties agree that Plaintiff was terminated in September 2004.

to action in Federal Court to protect its intellectual property in the area; and (6) IBM has made unsubstantiated characterizations of the Plaintiff's work performance that are neither supported by affidavit nor contemporaneously documented by any of her managers or colleagues.  Pl. Opp. at 21-22.  Plaintiff also argues that her transfers and "redeployments" in 2001, 2002, and particularly, 2003, were not a result of her own performance issues, but rather "wholly as a result of internal reorganization" within IBM.[37]  Pl. Opp. at 19; Pl. Dep. 88:1-13.

Further, Ms. O'Brien contends that IBM "has completely ignored [her] performance [prior to 2004]."  Pl. Opp. at 18.[38]  She asserts that her earlier performance evaluations demonstrate consistent praise for her work even though she was functioning in new roles with which she was unfamiliar.  See Id. at 18-20.  Plaintiff offers excerpts from the PBCs for 2001, 2002, and 2003, highlighting only positive feedback and omitting comments by her managers that she needed to improve in several areas.[39]  See Id.  Plaintiff also states that Ms. Kim, her line

---

[37]Plaintiff alleges that her move from Consulting to Project Management in 2001 was at a time where IBM reduced 4,000 employees from the IBM Consulting Group and 20,000 employees throughout the company.  See Pl. Opp. at 18-19.  She states that her prior good performance within the company enabled her to successfully obtain a new position within the company in the face of intense competition from many displaced colleagues.  See Id.  As support for her argument that her moves were the result of restructuring within IBM, Ms. O'Brien offers that "Susan Kim, herself, notes that 'On 10/1/2003, as part of the mission transfer from ibm.com to ISC, Pam joined my team,'. (Exhibit C)", see Id. at 19; however, the Court is unable to find this quote, but notes that Ms. Kim wrote "Pam made a career change to become the Advisory Project Manager for Content Management (CM)," in the corresponding PBC.  Ex. C, D00038.

[38]Plaintiff essentially concedes that she did not perform to IBM's standards in 2004, but attributes her problems to her disability and to IBM's failure to provide her with reasonable accommodations.  See Part V.B., infra.

[39]For example, Plaintiff quotes the PBC for the first half of 2001 in which Ms. Martin noted that: "Pam achieved 126.1% of utilization on a target of 70% and received good feedback from her peers.  They mentioned that she was dedicated to the project and was a good team player, pleasant to work with.  She also provided good mentorship to her PMA. . . . Finally, Pam

manager at the time, wrote in the 2003 review, "In 4Q03, Pam's role was expanded to include managing the project budget handling . . .", Ex. C, D00038, to show that "far from being unable to handle her existing role, the Plaintiff was given additional responsibilities at the very time when [IBM states] her performance" was so poor as to warrant termination within the year.  Pl. Opp. at 21.

Although Plaintiff's assertions appear to fall short of establishing that she was able to perform the essential functions of her job, prior to her injury or after it, at this stage, taking the facts in the light most favorable to the Plaintiff, evidence from Ms. O'Brien's three consecutive PBCs, in which she received a "3" rating, show she did achieve "some/most commitments."  Ex. C.  Thus, Plaintiff met some of IBM's legitimate expectations.

Second, Defendant challenges Plaintiff's assertion that IBM sought another to perform the same work after Ms. O'Brien had been removed from the position.  Ms. O'Brien appears to argue that she was replaced because her former colleague, Ms. Ramanauskas, continued working on certain matters that were originally assigned to Ms. O'Brien after her termination.  See Id. ¶ 49.  Plaintiff states that there is "no requirement that the replacing employee be new to the company – indeed 'shunt terminations' such as this are relatively common – the requirement is that the terminated employee's role be taken over by someone else rather than no longer being

---

provided a high level of energy on this project and was passionate and enthusiastic."  Ex. C, D00054.  Ms. O'Brien offers one-line excerpts that she accuses Defendant of relying upon and represents to the Court that there was no further comment.  See Pl. Opp. at 19-20.  Notably, also in this 2001 PBC, Ms. Martin stated, "[h]owever, her lack of knowledge of the [Strategic Outsourcing] business coupled with a need to develop her listening skills limited her ability to provide the leadership needed on this project.  In addition, the level of analytical skills necessary to re-define [the project] was not demonstrated."  Ex. C, D00054.  Plaintiff makes similar arguments for her other PBCs, highlighting sparse positive feedback and downplaying the areas in which her managers said she needed to improve.  See Pl. Opp. at 20-21.

required." Id. at 22.  Plaintiff attempts to make an argument similar to the one discussed in

Ehmann v. Sea Spa, LLC,  2005 WL 3439935, at *4 (App. Div. Dec. 16, 2005).  The Ehmann

court stated:

> There is only a subtle difference between replacement and retention.  To
> differentiate based upon the replacement of a new employee or the substitution of
> an existing employee is, at best, to rely on semantics.  The issue is not whether the
> protected individual is replaced by a new employee or an existing employee is
> retained to do the work following the departure, rather, the issue to be decided is
> whether an adverse employment action took place under circumstances that give
> rise to an inference of unlawful discrimination.  Here, defendant retained
> substantially younger employees to do the job performed by plaintiff.

Id.  In Ms. O'Brien's case, the facts are substantially different.

Defendant argues Ms. Ramanauskas was not a replacement, but rather was assigned to

assist Ms. O'Brien with her work in November 2003, almost a year before Plaintiff's termination

and three months before Plaintiff became disabled.  See Df. Reply at 4-5.  Plaintiff, however,

disputes this time line and contends that Ms. Ramanauskas was not assigned to work with her

until sometime after her accident.  See Pl. Opp. ¶ 22; Pl. Dep. 182:2-186:10.  Regardless of when

the assignment occurred, Defendant's contention is that Ms. Ramanauskas had been essentially

assisting and managing Plaintiff's project for a period of time well before her termination, and

that Ms. Ramanauskas simply continued to perform the same duties after Plaintiff's termination;

Plaintiff's position was essentially absorbed by Ms. Ramanauskas.  See Df. Reply at 4-5; Ex. Y.

Plaintiff does not dispute the duties Ms. Ramanauskas performed prior to Ms. O'Brien's

termination[40] or that Ms. Ramanauskas continued to perform those functions subsequent thereto,

but Plaintiff argues that this is sufficient to show that Defendant sought someone else to perform

_____

[40]However, Plaintiff disputes the reasons why Ms. Ramanauskas was assigned to work
with her.  See Part II.D., infra.

her work after her termination.  See Pl. Opp. at 22-23.  The Court disagrees.  As discussed here,

Plaintiff's termination does not give rise to an inference of unlawful discrimination.  See

Ehmann, 2005 WL 3439935, at *4.  Thus, Plaintiff is unable to show that she was replaced.

Accordingly, giving all favorable inferences to Plaintiff, she is unable to establish of establishing

a prima facie case of discrimination under the LAD.

### 2. Defendant's Non-discriminatory Reason for Plaintiff's Termination

Even if, however, Ms. O'Brien had established a prima facie case of discrimination under

the LAD, the burden of production would then shift to the defendant to show a non-

discriminatory reason for its decision.  In this case, IBM repeatedly articulates that it terminated

Plaintiff because of her poor performance.  In April 2004, IBM implemented the PBC 3x3

initiative, a job reduction program designed to identify and terminate the employment of

consistently low performers within the ISC Division.  See Df. Mot. ¶ 28; Pl. Opp. ¶ 24; Ex. Q.

IBM established objective criteria to determine whether an employee's performance met IBM's

legitimate expectation when it established the PBC 3x3.  First, IBM identified employees who

had received a rating of a "3" or lower on each of his or her past three PBCs.  An employee

falling into this category, who was not projected to improve his or her rating in the current year,

did not meet performance expectations.  See Df. Mot. ¶ 28  Ms. O'Brien admits that through

PBC 3x3 she was identified as a consistently low performer because she received a rating of a

"3" on her three consecutive prior PBCs, during 2001 through 2003.  See Id.; Ex. C.

Significantly, all three of these "3" ratings were given to Ms. O'Brien for her performance in

years before her alleged injury and disability, in 2004.  See Ex. C.

In 2001, Ms. Martin completed an assessment of Ms. O'Brien's performance for the first

half of the year, and she commented on Ms. O'Brien's "need to develop her listening skills," which limited her "ability to provide the leadership needed on this project."  Ex. C, D00054. Regardless of whether Plaintiff was reassigned due to restructuring within IBM or to find a better fit for her within the company, Plaintiff began working in a project development role under a different manager, Mr. Moran, in August 2001.  In her year-end PBC for the second half of 2001, Mr. Moran noted, "Pam has a very strong personality that is very effective in keeping things moving.  At times, however, Pam's strengths make it hard for her to see others' points of view, magnifying differences rather than ameliorating them."  Id., D00063.  According to the PBC, completed on February 4, 2003, which assessed Ms. O'Brien's performance for 2002, Mr. Moran determined that "Pam continued to struggle somewhat with her team goals.  Although she drew praise at times for her handling of her role, she also sometimes drew criticism for her personal interactions.  Pam needs to build on her strong organizational skills by adding some subject matter expertise rather than relying so heavily on her teammates."  Id., D00046.

In any event, in April 2003, Plaintiff began working as an advisory project management role in the content management organization reporting to Ms. Isdale and was subsequently transferred to Ms. Kim's section in late 2003.  See Pl. Opp. ¶¶ 6, 9; Df. Mot. ¶¶ 6, 9.  In January 2004, Plaintiff received her performance review for 2003, and while Ms. Kim delivered the review, the contents of the review were comprised almost entirely of input provided by Ms. Isdale since she had been Plaintiff's manager for most of 2003.  See Df. Mot. ¶ 11; Ex. C.

IBM contends that although Ms. O'Brien's managers included some feedback that might be considered positive in her PBCs, this does not demonstrate that she had met IBM's legitimate expectations in the three years preceding 2004 or in 2004.  Rather, a "3" rating meant that Ms.

43

O'Brien "achieved some/most commitments" and she was not subject to immediate job action. Thus, Plaintiff met the first objective part of the test for inclusion in the PBC 3x3.

Moreover, Ms. Kim did not expect Plaintiff to improve in 2004. Thus, although the exact date of this assignment is unclear, Ms. Kim designated Ms. Ramanauskas to work with Plaintiff. See Df. Mot. ¶ 10; Pl. Opp. ¶ 22. Ms. Kim also "scheduled weekly face-to-face meetings with Ms. Ramanauskas and Plaintiff[,] and bi-weekly one-on-one conference calls with Plaintiff to assist her progress," all of which continued through the remainder of Ms. O'Brien's employment with IBM. Df. Mot. ¶ 10. Plaintiff, herself, admits that she was unable to meet the deadlines required. See Pl. Opp. ¶ 22. Therefore, Defendant claims, Ms. O'Brien was included in the PBC 3x3 program; she was offered a SAP, which she declined; placed on a formal PIP, which she did not successfully complete; and, as a result, Ms. O'Brien's employment was terminated in September 2004. See Df. Mot. ¶ 57; Pl. Opp. ¶ 48.

Defendant argues and the Court agrees that it has presented substantial evidence to demonstrate that Plaintiff was not performing her job to IBM's expectations, including that Ms. O'Brien received consecutive sub-par annual performance ratings from at least three different managers from 2001 through 2003,[41] all before she became disabled, and IBM found that she did not demonstrate improvement in 2004, before or after her injury. IBM asserts that this all evidences that Ms. O'Brien was a low performer, who did not meet IBM's employment expectations, and that was the reason why Ms. O'Brien was terminated. The Court finds that Ms.

---

[41]From Defendant's perspective, Plaintiff was transferred three times between 2001 and 2003 "as a result of her performance issues and in an attempt to find a position she could handle[.] Regardless of the position, she required significant supervision, instruction and training from her managers and peers. Despite the additional attention and assistance, Plaintiff was still not able to adequately handle the demands of the job." Df. Mot. at 19.

O'Brien's poor performance is a legitimate, non-discriminatory reason set forth by IBM for its termination of Ms. O'Brien.

### 3.      Defendant's Reason was Not Pretext for Discrimination

As Defendant has presented a legitimate, non-discriminatory reason for terminating Ms. O'Brien, she must show by a preponderance of the evidence that this non-discriminatory reason was a pretext for discrimination.  Plaintiff, however, is unable to point to "some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." Laresca, 161 F. Supp. 2d at 335-336; Sheridan, 100 F.3d at 1067.  Plaintiff argues that IBM's PBC 3x3 program was pretext for discrimination here, because, (1) she was selected for inclusion in the program because of her disability and not because she performed below IBM's standards, and (2) the timing of her disability and her termination were not a mere coincidence.  In her rebuttal, Plaintiff also challenges Ms. Reiser's Report because it was not completed until a month after her termination and, she alleges, it was based on uncorroborated statements.[42]

First, Plaintiff argues that her selection into the PBC 3x3 initiative was a pretext for discrimination because the "only 'evidence' supplied [by IBM of her poor performance] is a third party account of alleged conversations reported by Leslie Reiser and completed over a month

---

[42]While the Court does not rely on the hearsay contained within the Report as the basis for granting Defendant's Motion, Ms. Reiser's findings reinforce IBM's argument that it believed Plaintiff was a consistently poor performer.

after the Plaintiff had been already terminated." Pl. Opp. at 22.[43]  The facts, viewed in the light

most favorable to Plaintiff, do not establish that Defendant used the PBC 3x3 program as a

pretext for discrimination.  Rather, the facts show that there was sufficient evidence to terminate

Ms. O'Brien based on her performance even before Ms. Reiser's investigation began.  Plaintiff

admits that she had received three consecutive "3" ratings on her preceding PBCs.  Ex. C.

Plaintiff also admits that she had trouble meeting deadlines.  See Pl. Opp. ¶ 22.  Moreover,

Defendant maintains that Plaintiff was "well aware that her PBC ratings were not favorable as

evidenced by her stated disagreement [with] her PBCs in 2001 and 2002 and reiterated in her

deposition testimony."[44]  See Ex. C, D00064 & D00047; Pl. Dep. 73:16-22; 77:9-78:5; 80:17-24.

By July 21, 2004, Plaintiff knew that her performance was unsatisfactory and that she was

being placed on a formal PIP.  See Pl. Opp. ¶ 27; Ex. S.  She also admits that she knew, by

August 4, 2004, that she was part of the PBC 3x3 program because she had received three

consecutive PBC ratings of a "3", that she was given 30 days to decide whether to accept a

severance package, and that she rejected the SAP.  See Pl. Opp. ¶ 27; Ex. R.  Plaintiff was also

---

[43]Although Plaintiff appears to argue that the only evidence of her poor performance is contained within Ms. Reiser's report, the Court notes that it has discussed at length the evidence IBM presented to support its determination that Plaintiff's performance was sub-par.  See Part V.A.2, supra.  Plaintiff claims that because she filed an Open Door Complaint, it would have been reasonable, "given the nature and the serious consequences for the Plaintiff," that IBM would have suspended the PIP process until after the investigation was completed "or, at the very least, extended the period of the PIP until the review was concluded," but they did not.  Pl. Opp. at 26-27.  Plaintiff asserts that she was terminated (in September 2004) before the findings of the investigation were determined (in October 12, 2004), which is true.  However, as evident from Ms. O'Brien's prior PBCs and performance in 2004, IBM had reason to terminate Plaintiff prior to the release of Ms. Reiser's report.

[44]For example, under the "Employee's Comments" section of her PBCs, Plaintiff wrote "I believe that the assessment should have been higher" and "I do not agree with the rating given." See Ex. C, D00064 & D00047.

aware that because she declined the separation package, her PBC was automatically classified as unsatisfactory, and she had 30-45 days to successfully complete her PIP.  See Pl. Opp. ¶ 27; Ex. R.  These events all occurred before Ms. O'Brien filed her Open Door Complaint in August 2004.  See Pl. Opp. ¶ 34.  Thus, Plaintiff's contention that the only evidence of her poor performance is within Ms. Reiser's findings is devoid of merit.

Although she does not challenge IBM's objective procedures for the PBC 3x3 initiative or the result for employees who failed to complete the PIP successfully, Ms. O'Brien alleges that Ms. Kim did not have to automatically place her in the program, despite Ms. Kim implying to her that inclusion in the program was automatic given her three successive "3" ratings.  See Id. Plaintiff claims that "eligible" employees were rated "red" or "green" according "to some unknown, subjective criteria" and there was "a target inclusion rate of 76%".[45]  Id.  Ms. O'Brien alleges that Ms. Kim included her in the program because of her disability; specifically, Plaintiff claims that Ms. Kim placed her on a PIP that was unreasonable because of her disability, and that "in reality, it didn't matter what was in the PIP because [Ms.] Kim had already decided that she was going to terminate" Ms. O'Brien.  Id. at 27-28.

As evidence for her contention that her disability was the reason for her selection in the program, Plaintiff states that Ms. Kim would not have stated that "I look forward to continuing to work with Pam" in the 2003 year-end PBC, if she had serious concerns about Ms. O'Brien's performance and intended to terminate her.  Pl. Opp. at 20; Ex. C, D00038.  Plaintiff claims that this comment supports her argument that a major event had to have occurred that would lead Ms.

─────────────────

[45]Plaintiff also claims that there was significant bias in the selection process against her and older employees at IBM.  See Part V.C., infra.

Kim to change her view of Ms. O'Brien and want to terminate her employment.  See Pl. Opp. at

20-21.  Plaintiff claims that her injury during the meeting in New York in February 2004 was this

major event, which required Ms. Kim to provide her with some accommodations.  Id.  But IBM

has presented overwhelming evidence from Ms. O'Brien's three prior assessments, with input

from three different managers before Ms. Kim, that there were significant problems with

Plaintiff's performance well before she became disabled in 2004.  See Part V.A.2, supra.[46]

In a further attempt to support her claim that her inclusion in the PBC 3x3 was due to her

disability, Plaintiff points to Ms. Kim's alleged advice in June 2004 that Plaintiff not take time

off for her back surgery.  See Pl. Opp. ¶ 26; Pl. Dep. 189:2-8, 193:8-18.  There is no evidence,

aside from Plaintiff's deposition testimony, that Ms. Kim made this comment.  Indeed, the

evidence is to the contrary because it shows that at that time Plaintiff had not received advice

from her physician to have surgery and thus there would have been no basis to have such a

discussion with Ms. Kim.  As evident from Dr. Cohen's Evaluation Notes from May 20, 2004,

Dr. Cohen simply directed Ms. O'Brien to "continue with frequent breaks at work, getting up

every thirty minutes," to "continue her home exercise program," and to follow-up with him as

needed, and only said that "if [Plaintiff] gets a recurrence of symptoms, at that point

consideration will be given to a surgical decompression."  See Ex. O (emphasis added).  In sum,

Plaintiff has failed to rebut IBM's assertion that she was selected into the PBC 3x3 because of

her poor performance.

Second, Plaintiff argues that the timing of her disability and then termination was not a

_____

[46]The Court notes that although the PBC 3x3 was not implemented until April 2004, there
are no allegations nor evidence set forth by Plaintiff that Ms. Kim or IBM designed the program
in order to target Ms. O'Brien for termination.

mere coincidence, but rather demonstrates that Defendant's reason for terminating her

employment was pretextual.  Plaintiff's reliance on Haschmann v. Time Warner Entertainment

Co., 151 F.3d 591 (7th Cir. 1998) is unavailing since the facts of that case are totally inapposite

to those here.  There the Court held:

> [T]aking the evidence in the [plaintiff's] favor, a jury reasonably could find that
> Ms. Haschmann was performing her job properly for a number of months, that the
> mistakes she began making (for which she was criticized by Keating) were related
> to her illness, that she showed adequate job performance after she returned to
> work from her first flare, that Keating had promised her a fair opportunity to do
> her job once she returned to work full time, that Ms. Haschmann's request for a
> second medical leave was accompanied by notice invoking the [Family Medical
> Leave Act], and that the timing of Keating's firing of Ms. Haschmann (days after
> her request for medical leave) was not merely a coincidence. . . . Moreover, the
> firing was carried out in spite of Ms. Haschmann's doctor's note that she take
> leave . . . These factors could cause a jury reasonably to believe that Time
> Warner's reason for firing Ms. Haschmann-poor performance-was not the real
> one.

Haschmann, 151 F.3d 604-05.  Defendant has submitted unconverted evidence that Plaintiff's

performance issues, upon which her selection as a low performer was made, began well before

her alleged disability.  Moreover, Plaintiff, although not willing to concede it now, was well

aware that her managers considered her a low performer, which is evident from her outward

disagreements with her performance ratings.  She wrote "I believe that the assessment should

have been higher" and "I do not agree with the rating given" in the "Employee's Comments"

section of her 2001 and 2002 PBCs, respectively.  See Ex. C, D00064 & D00047.  Thus,

Plaintiff's argument that the timing of her disability and termination demonstrates that

Defendant's stated reason for firing her was pretextual fails.

        In filing an Open Door Complaint, Ms. O'Brien raised her concerns regarding her

selection into the PBC 3x3 program and Ms. Kim's failure to properly explain the program's

implications to her in accord with IBM policy.[47]  Pursuant to its Open Door policy, IBM assigned Ms. Reiser to conduct an investigation of Ms. O'Brien's claims.  See Pl. Opp. ¶¶ 37-38.  Not surprisingly, upon the completion of Ms. Reiser's investigation and release of her findings, Plaintiff attacked the process.[48]  She claimed that Ms. Reiser's investigation fell well short of the standards expected by the guidelines, and that it was not conducted fairly or correctly.  See Id. ¶ 39.[49]  The inquiry for the Court in this discriminatory discharge claim is not whether Ms. Kim had to automatically place Ms. O'Brien in the program, or whether Ms. Kim explained to Ms. O'Brien IBM's PBC 3x3 program according to IBM's formal policy, or whether Ms. Reiser

---

[47]Even though Plaintiff challenges Defendant's procedure for employees who fell within Defendant's employee reduction program, i.e. whether the probation period was 30 or 45 days and whether the meeting with the employee discussing the employee's options needed to be formally documented.  That is not at issue before the Court.  The Court need only determine whether IBM engaged in illegal conduct when it terminated Ms. O'Brien, as the Court does not second guess the lawful business decisions of an employer, such as the mechanisms in place to process an employee's termination.

[48]The Court does not rely on the findings of the investigation in granting Defendant's Motion, but rather the investigation report simply confirms IBM's argument that Plaintiff was a consistently poor performer and the reason they terminated her was not because she was "disabled."  During her investigation, Ms. Reiser conducted numerous interviews, including interviews of all of Plaintiff's former managers Mr. Moran, Ms. Isdale, and Ms. Kim, and learned that all three of these former managers separately contacted HR regarding Ms. O'Brien's performance issues between 2001 and 2003.  See Ex. A at 4.  In addition, the uncontroverted and unanimous opinion of the several managers and peers interviewed in connection with Ms. Reiser's investigation was that Ms. O'Brien was a poor listener, chronically late, dictatorial, abrasive, incapable of teaming with others, and that she had a distorted view of her relative contribution to the value of the organization.  See Id. at 10.  Plaintiff's former managers and peers considered her to be overwhelmed by her responsibilities and poorly organized, and stated that her work product was often late, of an inferior quality compared to her peers, and not up to the standards of a project manager.  See Id.  Ms. Reiser determined Plaintiff was found to be a consistently inadequate performer, both before and after her injury, and that there was good cause for terminating her employment.

[49]Plaintiff does not articulate any evidentiary support for this conclusory assertion.

investigated Ms. O'Brien's claims to the standards expected by the guidelines.  Rather, the Court must determine if Plaintiff has rebutted IBM's legitimate, non-discriminatory reason for firing her – because she was a low performer.

Assuming, in the light most favorable to Ms. O'Brien, that her inclusion in the program was not automatic, IBM still has the ability to make business decisions based on the determinations of its managers.  IBM was aware that Plaintiff received only a "3" rating for three consecutive PBCs in 2001 through 2003 and it needed to assign her a teammate in 2003 or 2004, which continued until she was terminated in September 2004.  During an investigation, which began during her employment and was completed after her termination, Ms. Reiser determined that not only were Plaintiff's claims unfounded, but there was even further support for her inclusion in PBC 3x3 and ultimate termination.[50]  See Ex. A.

Plaintiff has failed to produce any evidence that contradicts Defendant's assessments or offers any opinion of her work performance contrary to that provided by Defendant.  Thus, Ms. O'Brien has failed to put forth any evidence to rebut Defendant's reason for terminating Plaintiff and no reasonable jury could find that her unsatisfactory performance was not the cause of her termination as opposed to being a pretext for discrimination.  Accordingly, the Court grants Defendant's Motion for Summary Judgment with respect to her wrongful termination claim based upon a disability.

### B.    Plaintiff's Request for Reasonable Accommodations

Plaintiff claims that IBM did not make proper and reasonable accommodations for her

---

[50]A Certification of the Investigator authenticating her Report has been submitted to the Court.  See Ex. HH.

disability as required by New Jersey law.  See Compl. Form A, § 1, para. 2.  A prima facie case

of failure to accommodate requires proof by the Plaintiff that (1) the she had a LAD handicap; (2)

was qualified to perform the essential functions of the job, with or without accommodation; and

(3) suffered an adverse employment action because of the handicap.  Bosshard v. Hackensack

Univ. Med. Ctr. , 345 N.J. Super. 78, 91 (App. Div. 2001).  The Supreme Court of New Jersey

has held that the LAD should be interpreted similar to the Americans with Disabilities Act

("ADA"), 42 U.S.C. §§ 12101-12213, and "an employer's duty to accommodate extends only so

far as necessary to allow a disabled employee to perform the essential functions of his job. It does

not require acquiescence to the employee's every demand." Id. (internal quotations and citations

omitted).

"[U]nless it would impose an undue hardship on the operation of the business, [New

Jersey law] requires an employer to make a reasonable accommodation to the limitations of an

employee who is a person with a disability."  Potente v. County of Hudson, 187 N.J. 103, 110

(2006); Taylor v. Virtua Health, Inc., 2007 WL 1827094, *5 (D.N.J. June 25, 2007).  Where

there is a failure to provide a reasonable accommodation claim, the Supreme Court of New

Jersey has found:

> Administrative regulations set out the specific requirements of the reasonable
> accommodation process mandated by the LAD.  In brief, unless it would impose
> an undue hardship on the operation of the business, N.J.A.C. 13:13-2.5(b) requires
> an employer to make a reasonable accommodation to the limitations of an
> employee ... who is a person with a disability.  However, an employer is not
> required to take action ;where it can reasonably be determined that an ...
> employee, as a result of the individual's disability, cannot perform the essential
> function of the job even with reasonable accommodation. N.J.A.C. 13:13-2.8(a).

Potente v. County of Hudson, 187 N.J. at 110-11 (internal quotations and citations omitted).

Further, to succeed on a failure to accommodate claim, the law requires that a plaintiff make her employer aware of her need for a reasonable accommodation for a handicap and the employer must have failed to engage in a search for an accommodation.  <u>Taylor</u>, 2007 WL 1827094, at *5.

Ms. O'Brien alleges that there are genuine issues of material fact with regard to this claim.  She contends that she made requests for accommodations for her disability, the need for which are documented in her physician's reports and were provided to IBM, that the requested accommodations were reasonable in the context of her job and IBM's business needs, and that the requested accommodations were not provided by her manager, Ms. Kim, either in the period after her accident or as documented in the PIP.  <u>See</u> Pl. Opp. at 30.  Plaintiff asserts that she submitted to IBM a Medical Treatment Report and physician evaluations by Dr. Cohen that set forth the accommodations she requested.  <u>See</u> Ex. F, G, & I.  Specifically, Plaintiff asserts that the two accommodations that she requested, but were denied, were (1) to take a break from sitting every 30 minutes and (2) that she not be required to lift more than 10 lbs.

First, Plaintiff complains that she was required to travel to Hawthorne, New York to meet with Ms. Kim at least once a week, which took her three-and-a-half hours plus any traffic delays during the round trip of 155 miles total, and she was required to be proactive in initiating and scheduling meetings in multiple IBM Divisions; both of which failed to comply with her physician's recommendation not to take extended car journeys.  <u>See</u> Pl. Opp. at 29.  Second, Plaintiff complains that although she was not supposed to lift or carry anything in excess of 10 lbs., when she attended meetings, she was required to carry her IBM ThinkPad computer, which

she estimates as weighing 7 lbs.[51], the AC unit for the computer, which she estimates as weighing 2 lbs., the carry case for the computer, which she estimates as weighing 2 lbs., and any files or documents required for the meeting.  See Id. at 29-30.  Thus, she claims that at a minimum she was required to carry items in excess of 10 lbs. when attending these meetings.  See Id.

With regard to the accommodation of needing to take breaks every 30 minutes, Plaintiff testified that Dr. Cohen had identified this accommodation in the forms that he completed and that were submitted to IBM.  Pl. Dep. 156:17-157:25; Ex. G & I.  Defendant asserts that Plaintiff was free to take breaks from sitting every 30 minutes or at any interval she desired, which was especially true considering Plaintiff worked primarily from home.  In addition, Defendant contends, and Plaintiff does not dispute, that when she had to drive to a meeting, she could have left additional time in order to take breaks as needed.[52]  However, Plaintiff claims that, due to her disability, she could not travel any farther than 30 minutes from her home and while she made such requests to IBM, she does not believe that her doctor put this request for accommodation in writing until after she was terminated.  Id. 156:10-16.  Plaintiff testified that her doctor:

> was very concerned that [she] was being forced to do what [she] - he finally wrote a letter, but it came out too late.  He was basically saying to IBM what is it about the fact that you are not supposed to be making her travel any further than 30 minutes from her home that you can't really understand.  That basically was the gist of the letter, and I told Susan Kim,

---

[51]IBM asserts that the IBM ThinkPad T30 laptop it issued to Ms. O'Brien in 2004 weighed approximately 4.9 lbs.  See McInterney Cert., Ex. JJ.

[52]IBM asserts that Plaintiff's alleged "accommodations" do not even qualify as accommodation requests because she was free to follow these suggestions without any assistance or permission from IBM.  In addition, when investigating Plaintiff's Open Door Complaint, Ms. O'Brien was asked by a HR manager if she had ever asked for any accommodations that were not granted and she allegedly "said no but she does drive 2 hrs to/from work and that does not comply with her doctor's advice that she walk every 30 min."  Ex. T.

> I told David Leip, I told human resources I'm not supposed to be traveling.
> I'm not supposed to be putting the strain on my back, and they would not -
> they refused to make accommodations, refused.

Pl. Dep. 154:6-17.

Plaintiff claims that although IBM agreed to her request, IBM then did not agree "to change the expected outcome as a result in respect of such things as meeting times, meeting locations and deadlines." Pl. Opp. at 29. IBM, however, is not required to acquiescence to the employee's every demand. See Bosshard, 345 N.J. Super. at 91. Plaintiff was already working primarily (60% of the time) from home and she admittedly had a problem completing the work assigned on time or to IBM's standards. See Pl. Opp. ¶ 22. When Plaintiff was required to make a drive, she was at liberty to leave her home when she wanted and stop as many times as she needed to during her trip. Furthermore, Plaintiff does not contend that she had a driving problem or that her doctor placed any geographic limitations on her driving.[53] The Court, taking the facts in the light most favorable to Plaintiff, cannot find that Plaintiff made a request for a reasonable accommodation with respect to driving that IBM denied.

With respect to Plaintiff's second accommodation, Defendant asserts that carrying her laptop, the AC unit or the carry case for the computer, the files or documents, or anything

---

[53]Even if Plaintiff's doctor had placed such restrictions on her driving, Plaintiff does not, and cannot, contend that driving is an essential function of her job, and thus, IBM did not have to accommodate such a request. Compare Fulton v. Johnson & Johnson Pharm. Research & Dev., No. 05-819, 2008 WL 544668, at *14 n. 14 (D.N.J. Feb. 26, 2008) (noting that the plaintiff's job description does not include driving between job sites, or driving to work, as one of its essential functions, and that where driving is not an essential function of plaintiff's employment, the employer need not make an accommodation for the plaintiff's inability to commute); see also Goldring v. Sillery Mayer & Partners, 119 F. Supp. 2d. 55, 57-61 (D. Conn. 1999) (drawing a distinction between the driving requirement of the plaintiff, as an art director, and that of a traveling salesman for whom travel would clearly be an essential part of the job).

totaling more than 10 lbs. is not part of Plaintiff's job duties.  Moreover, Plaintiff has not demonstrated that even if she had to bring items weighing more than 10 lbs. with her to a meeting, that she was forbidden from making more than one trip or using a cart or some other device with wheels to assist her in transporting these items.  Plaintiff therefore has failed to demonstrate that IBM denied any request for an accommodation in this regard.

Moreover, Ms. O'Brien's inability to do her work has nothing to do with her "medical condition."  She does not even argue, because she cannot, that her alleged requests for accommodations were in any way related to her failure to meet deadlines.  Indeed, there is no link between her disability and her poor job performance.  IBM did not fail to provide any requested reasonable accommodations to Ms. O'Brien.  Ms. O'Brien is unable to meet her burden, showing that she was qualified to perform the essential functions of the job, with or without accommodation.  But even if Ms. O'Brien could satisfy the first two requirements of the prima facie case of failure to accommodate, she is unable to show that she suffered an adverse employment action because of her handicap.  See Part V.A., supra.  Accordingly, the Court grants Defendant's request for summary judgment on Plaintiff's failure to accommodate claim.

### C.     Plaintiff's Age Discrimination Claim

Plaintiff alleges that IBM discriminated against her because of her age; she was fifty-eight at the time of termination.  Compl. Form A, § 1, para. 3.

In Monaco v. Am. Gen. Assur. Co., 359 F.3d 296, 303 (3d Cir. 2004), the Third Circuit articulated the requirements for establishing a prima facie case of discriminatory discharge based on age under the NJLAD:

To make out a prima facie case of age discrimination under the LAD, a plaintiff

must show: (1) that he is a member of a class protected by the anti-discrimination law; (2) that he was performing his job at a level that met his employer's legitimate expectations; (3) that he was discharged; and (4) that he was replaced by someone sufficiently younger to give rise to an inference of unlawful age discrimination.

Monaco, 359 F.3d at 303 (citing Swider v. Ha-Lo Indus., 134 F.Supp.2d 607, 621 (D.N.J. 2001)). As Plaintiff makes no allegation with respect to the fourth prong, that her alleged replacement – Ms. Ramanauskas – is "sufficiently younger" than Plaintiff, she cannot establish a prima facie case of age discrimination.

Further, in cases alleging age discrimination under the LAD, an employee must "show that the prohibited consideration(, age,) played a role in the decision making process and that it had a determinative influence on the outcome of that process."  Bergen Commercial Bank v. Sisler, 157 N.J. 188, 207 (1999) (internal quotations and citations omitted).  Although the discrimination must be intentional, an employee may attempt to prove employment discrimination by using either direct or circumstantial evidence.  Id. at 208.  However, subjective perceptions and personal opinions, without additional supporting evidence, are insufficient to sustain a LAD claim.  See Sgro v. Bloomberg, L.P., No. 05-731, 2008 WL 918491, at *16 (D.N.J. March 31, 2008); Camper v. Whelan, 2006 WL 3093689, at *4 (App. Div. Sept. 27, 2006).

In this case, Ms. O'Brien has failed to present evidence that her age was a determinative factor in her termination.  Instead, as Defendant asserts, her claim is based entirely upon her age at termination and her own subjective perception or personal opinion.  When Plaintiff was asked to articulate the basis of her age discrimination claim she testified:

Q:      . . . Are you contending you were terminated because of

your age?

A:     Yeah.  I think that was part of it.

Q:     Why do you believe that?

A:     I think I was the oldest person on the team.

Q:     Any other reason?

A:     I think – Kenneth White [an employee in IBM's legal department] said something like, you know, you are an employee at will, and he says, when you get sick or anything happens to you, he says, you should realize that you could be jeopardized or you could be let go.

Q:     And when did he make this comment to you?

A:     When I called him trying to find out why they released my personal documents to Attorney Hoffman.

Q:     Was that after your employment had already ended at –

A:     Yeah, yeah.

Q:     Do you have any reason to believe that Kenneth White had anything to do with your termination?

A:     No, it was Susan Kim.

Pl. Dep. 295:1-24.  Plaintiff's testimony did not point to any evidence that her age had any

influence on her termination.[54]

Nonetheless, Plaintiff alleges that her age affected IBM's decision to terminate her

because IBM was interested in someone who would be more productive and for a longer time.  In

that regard, Ms. O'Brien states that there is "direct evidence based on the statistics available that

_____

[54]Further, in her Open Door Complaint, filed approximately one month before her termination, Plaintiff failed to make any claims of age discrimination or discrimination with regard to her selection in PBC 3x3.  See Ex. W.

58

there was a distinct age bias in the PBC program." However, these "statistics" consist of Plaintiff's own ad hoc assessment of those employees targeted for termination. In that regard, Plaintiff references an IBM email, which she claims showed "that of 17 eligible employees in [her] division only 9 had been selected for inclusion in the program." Pl. Opp. at 24; Ex. Q, D2189-2191. Plaintiff states that of these seventeen eligible employees in her division, nine of them were given "green" status, which meant that their performance had improved, and eight were given "red" status, which meant that their performance had not improved sufficiently. Pl. Opp. at 24. In concocting her own statistical analysis based on service years, Plaintiff argues that there is evidence that the employees assigned "red" status were older employees, whereas those assigned "green" status were young employees. Pl. Opp. at 24-25. Plaintiff states that "being over 50 was a serious occupational hazard at IBM." Id.

IBM, however, offered evidence, through the Certification of Sandra J. Hutchinson's ("Ms. Hutchinson"), to demonstrate that there was no merit to Plaintiff's alleged statistical analysis and there was no consideration given to the ages of the employees in determining "green" or "red" status. See McInerney Cert., Ex. II.[55] Rather, the evidence shows that, in May

---

[55]Plaintiff moves to exclude the Certification of Sandra J. Richardson on the grounds that it is not relevant. The certification was actually supplied by Sandra J. Hutchinson ("Ms. Hutchinson"), and was submitted as an exhibit to IBM's reply brief in support of its Motion, only to refute Plaintiff's misguided calculations. See McInerney Cert., Ex. II. Ms. Hutchinson's Certification provides factual information with regard to the ages of certain IBM employees as of the time of the PBC 3x3 initiative in May 2004. Defendant submitted these ages to dispute Plaintiff's assertions that age played a role in determining whether an employee qualified under the PBC 3x3 and whether that employee had demonstrated sufficient improvement to warrant her exclusion from the program; the ages of the employees retained were between 40 and 58 years of age. This information is relevant evidence under the F.R.E. 401, which defines "relevant evidence" as evidence "having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable that it would be without the evidence."

2004, the ages of employees afforded "green" status were: 40, 42, 47, 50, 51, 53, 54, and 58.  <u>Id.</u>

Thus, a majority of them were over 50 years of age, and all were in the protected class of being

over 40.  The numbers refute Plaintiff's personal assessment that the PBC 3x3 was a pretext for

age discrimination.

Further, Plaintiff alleges that IBM practiced "unlawful discrimination by imposing

different terms and conditions of employment on the Plaintiff than those imposed on younger

employees.  These terms and conditions included subjecting her to monitoring while younger

employees were not monitored in the same fashion (in this case by Fran Ramanauskas), failure to

advise her of the reasons they were monitoring her and not presenting her with their findings at

the time of each monitoring occasion.  None of these terms and conditions were imposed on

younger member of staff regardless of their PBC rating."  Pl. Opp. at 31.  Plaintiff fails to

provide any evidentiary support for her allegations.  Simply, Plaintiff has failed to make out a

<u>prima</u> <u>facie</u> case of age discrimination.  <u>See</u> <u>Id.</u>

However, even if Plaintiff could satisfy her burden, the Court must employ the same

burden shifting scheme as articulated under the wrongful termination claim.  <u>See</u> <u>McDonnell</u>

<u>Douglas</u>, 411 U.S. 792, 802 (1973); Part V.A., <u>supra</u>.  Here, Defendant has articulated a

legitimate, non-discriminatory reason for IBM's action, specifically, Ms. O'Brien's inadequate

---

Plaintiff asserts that Ms. Hutchinson's Certification is not sufficient because IBM did not
provide information beyond the names and ages of certain IBM individuals at the time of the
PBC program, <u>see</u> Pl. Mot. Hutchinson at 3, but it appears that Plaintiff is arguing about the
weight of the evidence and not its sufficiency.  Ms. Hutchinson's Certification is relevant
because it is evidence that directly refutes Ms. O'Brien's assertions regarding the ages of the
retained employees who were between 40 and 58 (Plaintiff's age) years of age.  <u>See</u> Df. Opp. at
4.  Because the Court finds that these ages are relevant under F.R.E. 401 and not unduly
prejudicial under F.R.E. 403, the Court denies Plaintiff's Motion.  <u>Fed. R. Evid.</u> 401, 403.

job performance, which had been documented for years, and her failure to demonstrate

improvement.  See Part V.A., supra.  Plaintiff has failed to rebut Defendant's business reason or

to offer evidence to show that her performance was not the cause of her termination.  See Id.

Accordingly, the Court grants Defendant's Motion with respect to Plaintiff's age discrimination

claim.

###    D.    Plaintiff's Claim of Job Discrimination

Plaintiff claims that IBM committed "job discrimination" with regard to her work

assignments and changing job descriptions and did not provide promised re-education courses

and certification.[56]  Compl. A, § 1, para. 5.  Plaintiff alleges that as a result of several

reorganizations within IBM between 2001 and 2003, she was constantly reassigned to new jobs

and new managers, which adversely affected her position in the PBC review process, as the

constant changing of roles caused her performance to suffer and resulted in poor performance

appraisals.  Pl. Opp. at 32-34.  Plaintiff was transferred from being a consultant on an internal

project under Ms. Martin to a project development role under Mr. Moran in August 2001, then

transferred to an advisory project management role under Ms. Isdale in April 2003, and then

transferred to an allegedly less demanding project management role under Ms. Kim in October

2003.  Ex. C.  Plaintiff alleges that the primary reason for her ratings as "'only' satisfactory in

[her] PBCs was her lack of specific subject knowledge areas and under a succession of new

---

[56]The Court notes that the LAD prohibits discrimination on the basis of certain defined
characteristics, e.g. race, creed, color, disability, etc.  N.J.S.A. 10:5-12(a).  To prevail, if this case
were to reach trial, Plaintiff would have to prove that her status in a protected class was a
motivating or determinative factor for the adverse job action against her.  See Martinez v. Nat'l
Broadcasting Co., 877 F. Supp. 219, 228 (D.N.J. 1994).  Plaintiff fails to allege that a defined
characteristic under this claim was a factor for Defendant's action here.

managers.  She took advantage of the limited training that as made available but this was insufficient to give her complete subject knowledge despite her repeated requests for additional training to be made."  Pl. Opp. at 34.[57]  Plaintiff then alleges that her "repeated job moves and consequent inexperience in roles" were not simply "tough luck"; instead, the PBC criteria were not equally applied to IBM employees.  Id.  In a conclusory manner, Plaintiff asserts that she was "clearly discriminated against in the application of the PBC process" and "this discrimination in process led IBM to use her inclusion in the PBC process as a pretext for her termination."  Id.

Taking the facts in the light most favorable to Plaintiff, assuming that the reassignments did negatively affect Plaintiff's performance and, therefore, her PBC rating, Plaintiff does not demonstrate that these reassignments were a pretext for discrimination.  The job reassignments occurred between July 2001 and October 2003, which preceded Plaintiff reporting to Ms. Kim in 2003, and her alleged disability in February 2004.  As a result, Plaintiff's back injury (disability) could not have been a consideration, let alone a determinative factor, in the decision to change her job descriptions and work assignments.  Moreover, Plaintiff has not presented evidence, or even alleged, that Ms. Kim, whom Plaintiff claims was behind her termination,[58] had any role in Ms. O'Brien's various reassignments.  In fact, Ms. Kim was Plaintiff's fourth and final IBM

_____

[57]Defendant asserts that in the opinion of her former managers, Ms. O'Brien's poor performance made her a candidate for reassignment, rather than vice-versa, as quality performers are generally not reassigned out of roles where they have demonstrated an ability to succeed.  See Df. Reply at 10.

[58]Plaintiff testified that she believed that Ms. Kim was the person behind her termination.  See Pl. Dep. 295:21-24.  Plaintiff, however, did not allege that Ms. Kim was actually involved in her termination – beyond identifying Ms. O'Brien as meeting the criteria for the PBC 3x3 program.  Moreover, Ms. O'Brien does not contend that Ms. Kim was the ultimate decision maker or even the one in charge of deciding to terminate her employment at IBM.

manager.  Because Plaintiff is unable to present any evidence to establish a <u>prima</u> <u>facie</u> case of discrimination or that Defendant's legitimate, non-discriminatory reason for termination was a pretext for discrimination, Plaintiff has failed to articulate any evidence that discrimination played a role in her job reassignments.  Thus, the Court dismisses this claim.

**E.     Plaintiff's Hostile Work Environment Claim**

Plaintiff alleges that IBM and specifically her superior, Ms. Kim, "poisoned [her work environment] with taunts, harassment and alienation and made practical jokes about the plaintiff after the disability and accident occurred."  Compl. Form A, § 1, para. 7.  To establish a hostile work environment claim under the LAD, a plaintiff must demonstrate that (1) the complained-of conduct would not have occurred, but for the plaintiff's disability, and that it was (2) severe or pervasive enough to make a (3) reasonable person believe that (4) the conditions of employment were altered and the working environment was hostile or abusive.  <u>See</u> <u>Lehmann v. Toys 'R' Us, Inc.</u>, 132 N.J. 587, 603-03 (1993); <u>see also</u> <u>Taylor v. Metzger</u>, 152 N.J. 490, 498 (1998).

The LAD "is not a guideline for workplace civility," and therefore, "offensive comments or jokes are not enough to state a claim for discrimination."  <u>McDonough</u>, 2007 WL 1456202, *8 (citing <u>Herman v. Coastal Corp.</u>, 348 N.J. Super. 1, 20-23 (App. Div. 2002)).  Similarly, "[a] supervisor that behaves in a cold, uncivil, inhospitable, or even boorish way [does] not engage in harassment so severe and pervasive."  <u>Id.</u> at 9 (citing <u>Shepherd v. Hunterdon Dev. Ctr.</u>, 174 N.J. 1, 25-26 (2002)).  Employees are not guaranteed a "perfect workplace, free of annoyances and colleagues she finds disagreeable."  <u>Lynch v. New Deal Delivery Serv.</u>, 974 F. Supp. 441, 452 (D.N.J. 1997).  Rather, "what is illegal is a 'hostile work environment' not an 'annoying work environment.'"  <u>Id.</u>  Thus, "'simple teasing,' offhand comments, and isolated incidents (unless

63

extremely serious) will not amount to discriminatory changes in the 'terms and conditions of employment.'"  Faragher v. City of Boca Raton, 524 U.S. at 788 (1998) (quoting Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. at 82 (1998)).  "[C]onduct must be extreme to amount to a change in the terms and conditions of employment."  Id.  Ultimately, "whether an environment is 'hostile' or 'abusive' can be determined only by looking at all the circumstances," which "may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a merely offensive utterance; and whether it unreasonably interferes with an employee's work performance."  Harris v. Forklift Sys., Inc., 510 U.S. 17, 23 (1993); see also Taylor, 152 N.J. at 499.

In Lehmann, the Supreme Court of New Jersey held that an employer is strictly liable for equitable relief to remediate any discriminatory hostile environment found in the workplace.  132 N.J. at 616-17.  However, a claim for compensatory damages is governed by "agency principles." Id. at 619.  An employer is generally liable for a hostile work environment created by a supervisor because the power an employer delegates to a supervisor "to control the day-to-day working environment" facilitates the harassing conduct.  Id. at 620; see Restatement (Second) of Agency § 219(2)(d).  But under agency principles, an employer is not generally liable for harassing conduct by co-workers, "[b]ecause employers do not entrust mere co[-]employees with any significant authority with which they might harass a victim."  Parkins v. Civil Constructors of Ill., Inc., 163 F.3d 1027, 1032 (7th Cir. 1998); Heitzman v. Monmouth County, 321 N.J. Super. 133, 145 (App. Div. 1999).  Therefore, when a co-worker engages in harassing conduct, the employer is liable only if "management-level employees knew, or in the exercise of reasonable care should have known, about the campaign of harassment."  Hunter v.

64

Allis-Chalmers Corp., 797 F.2d 1417, 1421 (7th Cir. 1986); see also 1 Barbara Lindenmann &

Paul Grossman, Employment Discrimination Law 822 (3d ed. 1996) (An employer is liable for

the harassing conduct of a co-worker "only if it had actual or constructive notice of the

harassment and failed to take prompt and appropriate corrective action.").

 Plaintiff claims that her manager, Ms. Kim, "subjected her to regular harassment

regarding her inability to perform her role in exactly the way, and to the standard, that [Ms. Kim]

required" because of her disability.  Pl. Opp. at 35.  As support for her position that her

manager's treatment amounts to a hostile work environment, Plaintiff testified that she was

ridiculed by Ms. Kim on two or three occasions:

> Q: I'm asking you for examples of how Susan Kim ridiculed
> you.
>
> A: Oh, she used to make fun of me all the time in front of Fran
> Raminowkis [sic].
>
> Q: Okay, how did she do that?
>
> A: Oh, what kind of person can't do a spreadsheet like you are
> doing it, Fran.  And then she would laugh.  She would say
> things on calls to ridicule me in front of other people who I
> really frankly didn't even know, and I would say, But Susan
> – the thing is, if you are on a conference call with other
> folks, you are not expecting a manager to ridicule you or to
> chastise you or subject you to abuse or even counsel you in
> front of a team of people, even if you were the worst
> worker in the would or the worst deadbeat.  Never mind
> that you had been given the things that were put on the back
> burner and you were given dispensation from doing them
> because she wanted me to take a day at a time, and I said I
> needed time off, and after putting myself through all this,
> she ridiculed me in front of everybody and it was very
> embarrassing.

                        *              *              *

Q:      Just before we broke, Ms. O'Brien, you said there were two
        or three other incidents in which Susan Kim ridiculed you.
        You described one involving a spreadsheet.  Can you
        describe those other two incidents?

A:      Yes.  One of them was I had to give a presentation.  I had to
        travel two hours to her office and give a presentation, and
        something happened to one of the connections and the
        computer went down which I had the presentation on, so I
        asked her to, if I could borrow her computer.  And the other
        person who had to come over from the Watson setup – and
        it was going to be at David Leip's office – and in front of
        him, she said, I don't care what happened to your computer.
        I'm not letting you borrow mine.  You can fix it yourself.
        And she walked off and was laughing while I was trying to
        give a presentation on her behalf and this other gentleman.
        I'm trying to remember his name.  I'm sure it will come to
        me.  But anyway, he helped me use his computer and we
        transferred everything over and she – it was just so
        embarrassing to be treated by your manager like that in
        front of people you were trying to help and do a
        presentation for.  And I know he said to me, he says, he
        said, I can't believe that a manager would do that.  We went
        into the meeting, and because of his help, I was able to give
        the presentation, but she was absolutely useless.

Q:      All right.  Any other incidents where you say she ridiculed
        you?

A:      Well, she ridiculed me all the time to my face.  It was
        almost like torture.

Q:      Can you give me examples?

A:      Well, I said to her, I said, if you want to go over materials, I
        said, I have a certain agenda for the meeting of things that I
        want to go over, but, I said you change the agenda when we
        get here and you don't give me copies of any of the
        documents that you want to review.  And I said, I just think
        if there are certain things you want to review, at least make
        a copy of those things that you want to go over so I can take

                                    66

> them back with me and I know exactly what you are talking
> about, and she refused and laughed and said, you should be
> able to remember all of it.  I said, I can't because you are
> not showing me the documents that you are reading from
> and I don't have a copy of them, and she just laughed.

Q:      Okay.  Anything else?

A:      Oh, those are the ones I remember right now.

Pl. Dep.  291:16-294:22.  Ms. O'Brien further claims that although she notified Ms. Kim's

manager, Mr. Leip, about how Ms. Kim was treating her, Mr. Leip allegedly failed to investigate

or take any action.  See Id. 137:5-141:4.  Plaintiff then allegedly referred the matter to Mr. Leip's

manager, Daryl Turner ("Mr. Turner"), who, while initially more sympathetic, also allegedly

failed to take any action.  See Id. 141:2-143:18.  Plaintiff also alleges that Ms. Kim began

subjecting Plaintiff to ridicule and humiliation in front of her colleagues, including assigning Ms.

Ramanauskas to oversee her work, even though this oversight was not inflicted on any other

member of the team, irrespective of their PBC assessments.  Pl. Opp. ¶ 22.

Ms. O'Brien also identifies Ms. Ramanauskas as another person who harassed her

regarding the veracity of her disability.  Ms. O'Brien testified:

Q:      Okay.  How did Fran taunt you or ridicule you?

A:      Well, in front of the manager that was sitting there, she
        basically gave me a hard time and said, well my time is
        more important than your having to go take a break, and I
        said I have to take a break because of my back.  I said its
        not negotiable.  You should have been told by Susan Kim
        that that was the case and I have to go now, and she started
        lambasting me and I had to leave.

Q:      How did she lambast you?

A:      Yelling.

Q:      What did she say?

A:      I don't think you have a herniated disk at all, something
        like that.

Q:      And she yelled at you?

A:      Yes, yes.

Q:      Any other incidents involving Fran Raminowskis [sic]
        where she ridiculed you or taunted you?

A:      Her particular nature, she was – she was very domineering
        and aggressive, and to the point of putting her nose in
        things that really were personal discussions that I thought I
        was having only with my manager, and that my manager
        was only having with me, and come to find out, my
        manager was saying things to her that should never have
        been discussed.

Q:      How did Fran taunt you in that regard?

A:      Well, she said, well, Susan said to me, she says, that we
        don't know if you have a herniated disk, and I said, Susan
        should not be taking to you about my personal medical
        condition except to tell you that I need to take breaks and
        that I need to take breaks possibly every 30 minutes, and
        that's all you really need to know.

Q:      Anything else?

A:      There are many other things.  I just can't remember them all
        right now.  I think the one thing that troubled me a lot was
        her saying that I really had a bad problem with my back and
        it was being made worse by what I was being put through,
        and to be ridiculed like that after you were jumping through
        hoops that I probably should never have jumped through,
        that she was saying these things.  It bothered me
        tremendously.

Pl. Dep. 296:6-297:25.  Plaintiff also claims that she endured a hostile work environment

because Ms. Kim alleged told her that her job would be in jeopardy if she took time off for

68

surgery for her back condition.  See Pl. Opp. ¶¶ 26, 36; Pl. Dep. 189:2-8, 193:8-18.  Although

Ms. O'Brien alleges that she did not have the back surgery because of Ms. Kim's comment, she

fails to provide any evidence that she actually needed or intended to undergo this surgery.  Pl.

Dep. 118:15-120:5.

The Court is convinced that no reasonable jury could conclude that the allegedly

discriminatory comments made to Ms. O'Brien or in her presence were so severe or pervasive

that a reasonable person with an herniated disc would believe that the conditions of employment

had been altered and that the working environment was hostile or abusive.  When viewing the

evidence most favorably to plaintiff, as required on a motion for summary judgment, the

comments made or actions taken by Ms. Kim – a comment by Ms. Kim concerning Ms.

O'Brien's inability to create a spreadsheet, Ms. Kim refusing to permit Plaintiff to borrow her

computer to give a presentation when Plaintiff's computer had failed to function, changing the

meeting agenda without warning Plaintiff or giving her documents related to the new agenda, or

assigning an assistant or mentor – could be at most described as discourteous or insensitive, but

they are not so severe or pervasive as to alter the conditions of employment or render the working

environment hostile or abusive.[59]  Moreover, none of Ms. Kim's comments mention a disability

and there is no evidence that Ms. Kim's alleged conduct toward Plaintiff was as a result of a

disability.[60]

_____

[59]Furthermore, as Plaintiff estimates that she worked from home about 60% of the time.
Thus, more often than not she worked in an environment free from her co-workers and of their
accompanying comments.  Pl. Dep. 89:1-16.

[60]The Court notes that any alleged failure of Mr. Leip and Mr. Turner to take action with
respect to Ms. O'Brien's complaints regarding Ms. Kim's comments are not evidence of the
existence of a hostile work environment.

Ms. O'Brien also alleges that she was harassed by her co-worker, Ms. Ramanauskas, who subjected Ms. O'Brien to "a series of cruel and unkind comments about her inability to operate at full speed because of her medical condition."  Pl. Opp. ¶ 22.  Ms. O'Brien, however, identifies only one incident where Ms. Ramanauskas yelled at her in disagreement over a break.  Ms. Ramanauskas's conduct in this instance is neither sufficiently severe nor pervasive to alter Ms. O'Brien's conditions of employment.  In addition, although Plaintiff alleges that this activity was at Ms. Kim's instigation, see Pl. Opp. at 37, there is no evidence that the employer or management had knowledge of this alleged incident or that Ms. O'Brien informed Mr. Leip or Mr. Turner about it when she made her complaints against Ms. Kim.  See Parkins, 163 F.3d at 1032; Heitzman, 321 N.J. Super. at 145.

Therefore, when viewing at all of the circumstances, including the frequency of the discriminatory conduct, its severity, and whether it unreasonably interferes with an employee's work performance, no reasonable jury could find that Ms. O'Brien's allegations rise to the necessary level of extreme conduct, amounting to a change in the terms and conditions of employment.  See Harris, 510 U.S. at 23; Taylor, 152 N.J. at 499.  Consequently, these offensive comments did not rise to the level required to demonstrate a discriminatory hostile work environment and the Court dismisses this claim.

### F.    Plaintiff's Retaliation Claim for Lack of Reasonable Accommodations

Plaintiff also alleges that IBM retaliated against her "for complaining about a lack of proper and reasonable accommodations for disability and for Plaintiff's doctor's instructions being purposely ignored" and that IBM "threatened loss of job if [Plaintiff] went through with necessary surgical procedures at that time or in the future due to disability and accident which

occurred on the IBM SITE."  Comp. Form A, § 1, paras. 8 & 10.

When analyzing a retaliation claim under the LAD, the Court employs the same McDonnell Douglas three-step burden-shifting analysis that it uses to evaluate a discrimination claim.  See 411 U.S. 792; Ferguson v. Deptford Twp., No. 06-2112, 2008 WL 5401630, at *4 (D.N.J. Dec. 22, 2008); Part V.A., supra.  The retaliation provision of the LAD prohibits an employer from taking reprisals against an employee because: (1) the employee has opposed any practices or acts forbidden under the LAD or (2) the employee had filed a complaint, testified or assisted in any proceeding under the LAD.  N.J.S.A. 10:5-12(d).  The Supreme Court of New Jersey has articulated that "[t]o establish a prima facie case of discriminatory retaliation, plaintiffs must demonstrate that: (1) they engaged in a protected activity known by the employer; (2) thereafter their employer unlawfully retaliated against them; and (3) their participation in the protected activity caused the retaliation."  Craig v. Suburban Cablevision, Inc., 140 N.J. 623, 629-30 (1995) (internal citations omitted).  The Court has refined the analysis and included that "as a prerequisite for proceeding on a retaliatory discharge claim, a plaintiff must also bear the burden of proving that he or she had a good faith, reasonable basis for complaining about the workplace behavior."  Tartaglia v. UBS PaineWebber Inc., 197 N.J. 81, 125 (2008).

Defendant challenges Ms. O'Brien's ability to establish a prima facie case of retaliation on the grounds that there was no request for accommodation that was denied or a complaint that such a request was denied, and even if there was, IBM was not aware of her complaint(s), and there is no causal link between her alleged protected conduct and her adverse employment action

of termination.[61]  Ms. O'Brien alleges that she was retaliated against as a result of her repeated

complaints to Ms. Kim that Ms. Kim was forcing her to work in a way that contravened her

doctor's instructions, specifically, that she was forced to drive two hours to and from work,

which does not permit her to take a walk every 30 minutes.  See Pl. Opp. at 37; Pl. Dep. 150:15-

24.[62]  The Court has already determined that Plaintiff did not show that she made any request for

an accommodation nor that IBM denied any such request.  See Part V.B., supra.  Thus, Plaintiff,

cannot satisfy her burden that she engaged in protected conduct known to the employer.

Moreover, Plaintiff cannot satisfy her burden of establishing a prima facie case, because

although Plaintiff states that "[t]here exists a clear causal link", she fails to present any evidence

that the reason for her termination was that she made such complaints about IBM's failure to

accommodate her disability.  Pl. Opp. at 38.  Thus, Ms. O'Brien fails to show a causal connection

between her complaints and her termination, and a bare allegation is insufficient to meet her

burden going forward.

---

[61]Both parties discuss Plaintiff's potential need for back surgery due to her "disability" and the fact that to date Plaintiff has not undergone back surgery.  Plaintiff, however, does not allege that she actually requested time off for back surgery or that she was terminated because of such a request.  Therefore, the Court need not further address this issue.

[62]Defendant argues that Plaintiff never complained that she was being denied her alleged requested accommodations.  IBM asserts that even if Ms. O'Brien did complain, IBM is still unaware of "which accommodations were denied, when and/or how," as evidenced by Plaintiff's admission that in her August 2004 conversation with HR she was asked whether she had asked for any accommodations that were not granted, to which she responded "no" and then followed with the comment that she had to drive to work  in a way that contravened her doctor's instructions.  Df. Reply at 12-13.

Defendant also argues that even if Plaintiff's contradictory statement to HR could constitute a complaint, it took place more than a month after Plaintiff had been informed of her inclusion in the PBC 3x3 initiative and after she had been placed on a PIP, and, therefore, this action and her subsequent termination could not be considered causally linked.  See Id.  The Court agrees with this statement, which is relevant to a finding of no causation.

Even if Plaintiff could establish a prima facie case of retaliation, the Court has already determined that Plaintiff's inadequate performance, and not her disability, was IBM's reason for her termination, and Plaintiff has failed to rebut such reasoning as a pretext for discrimination. See Part IV.A., supra. Accordingly, Defendant's request for summary judgment on Ms. O'Brien's retaliation claim is granted.

### G.      Plaintiff's Worker's Compensation Retaliation Claim

Plaintiff alleges that IBM retaliated against her for having reported an accident as a worker's compensation claim. See Compl. Form A, § 1, para. 4. It is unlawful for an employer to discharge an employee because she has filed a claim for workers' compensation benefits. N.J.S.A. 34:15-39.1.

"To make a prima facie case for a retaliatory discharge the employee must prove: (1) that [she] made or attempted to make a claim for workers' compensation; and (2) that [she] was discharged in retaliation for making that claim." Cerracchio v. Alden Leeds, Inc., 223 N.J. Super. 435, 442-43 (App. Div. 1988). "The plaintiff must establish that he or she was in fact terminated for filing a claim for workers' compensation benefits, then the burden shifts to the defendant to show that the plaintiff was discharged for another, non-pretextual reason." Patterson v. Black Tiger Co., Inc., 2005 WL 1017595, at *2 (N.J. Super. Feb. 18, 2005). In determining whether a plaintiff has established this claim, courts have held that a cause of action resting solely upon the timing of two events - a claim for benefits and a subsequent adverse job action – is an insufficient basis to withstand a motion for summary judgment. See Gaglion v. New Community Corp., 2007 WL 2141429, at *2 (App. Div. July 27, 2007); see also Morris v.

73

Siemens Components, 928 F. Supp. 486, 494 (D.N.J. 1996) (holding that "mere unsupported conclusory allegations contained in [a] complaint are insufficient to create a genuine issue of material fact in order to withstand summary judgment.").

In this case, Plaintiff submitted Dr. Cohen's Medical Treatment Report along with a Worker's Compensation claim to IBM on March 3, 2004.  Ex. I.  Plaintiff's workers' compensation claim was allegedly referred to IBM Workers' Compensation Insurance carrier, Liberty Mutual.  See Df. Mot. ¶ 23; Ex. H.  On May 12, 2004, Liberty Mutual informed IBM that it was denying Plaintiff's workers' compensation claim because "Plaintiff would not talk to Liberty Mutual and/or provide any medical documentation regarding her back injury."  See Ex. M.  On May 14, 2004, Liberty Mutual informed Plaintiff that after conducting an investigation of her claim, it determined that she did not suffer an occupational injury and that no workers' compensation benefits would be paid.  See Ex. N.  Although Plaintiff disputes that she was uncooperative with Liberty Mutual's investigation and instead states that Liberty Mutual's documentary evidence shows that it completed "a thorough investigation of the above captioned claim," Ms. O'Brien admits that the claim was denied.[63]  Although Plaintiff did not appeal

_____

[63]Plaintiff argues that IBM disguised its interest in the outcome of her workers compensation claim, and that Ms. Kim's opinion on whether she should have filed the claim, led to Ms. O'Brien's termination from IBM.  Plaintiff argues: "IBM has sought to demonstrate that the claim was passed on to Liberty Mutual for consideration and 'was outside of their control' and, in effect, they had no further interest in its outcome.  It is unclear, therefore, why Kim told not only the Plaintiff directly but also Leslie Reiser that she thought the Plaintiff was wrong to make the claim.  If IBM's stance is to be believed, then it would have made no difference to Kim whether the Plaintiff submitted a claim or not.  Kim is, of course, entitled to hold her own personal opinions.  What she is not entitled to do is to advance those opinions as a reason for an employee's termination when it is contrary to law.  This is what she did."  Pl. Opp. at 32.  Taking the facts in the light most favorable to Ms. O'Brien, Ms. O'Brien filed a workers' compensation claim and it was denied, whether IBM had an interest in the outcome of the claim is irrelevant so

Liberty Mutual's determination,[64] Plaintiff did file a workers' compensation claim, and thus, she

has satisfied the first prong of the prima facie case.

Plaintiff alleges that she was terminated because she made a claim for worker's

compensation.  She claims that Ms. Kim told her that making the claim was "ill-advised" and

that Plaintiff had shown "very poor judgment" in reporting the accident at the IBM facility.  Pl.

Dep. 114:3-21, 189:17-25.  During the Open Door investigation, Ms. Kim told Ms. Reiser that

Ms. O'Brien showed poor judgment in submitting the claim.  See Ex. E, D00200.  Defendant

argues that Ms. Kim "expressed her opinion that Plaintiff's decision to not inform her manger

(Kim) of the injury or that she had filed a medical claim was poor judgment – not that filing an

injury claim was poor judgment."  Df. Reply at n. 5 (citing to Ex. E).  Based on this remark, it is

possible that Ms. Kim did believe that Plaintiff's worker's compensation claim submission was

ill-advised.  There is overwhelming evidence, however, that even if Ms. Kim was unfavorably

disposed toward Ms. O'Brien for a number of reasons as outlined herein, including her filing of

the injury claim, nonetheless the Court finds that the filing of the worker's compensation claim

was not the reason that IBM terminated Plaintiff.  First, Ms. Kim was not the sole decision maker

and moreover, she did not have the ultimate say, as Ms. Thomas and Mr. Ostrosky also reviewed

and had input in Ms. O'Brien's selection into the PBC 3x3 program and red status.  Second, there

is no evidence that Ms. Kim's personal opinion of Ms. O'Brien's worker's compensation claim

_____

long as it was not the reason why Plaintiff was discharged, and it was not.  See Part V.A.2.,
supra.

[64]Defendant claims that Plaintiff filed a claim for retaliation in the New York Workers'
Compensation Court and that it was dismissed on procedural grounds.  See McInerney Cert., Ex.
GG.  The Court is unable to discern why the parties "indicate[d] that [the] case should not be
continued at [that] time," and thus it bears no weight here.

impacted any of IBM's decisions, or that any IBM decision makers were aware of Ms. Kim's views on Plaintiff's filing of a medical or worker's compensation claim. Indeed, nowhere in the massive records produced regarding Plaintiff's placement in the PBC 3x3, her red status, and ultimate termination is there any mention by any IBM employee of Plaintiff having filed a worker's compensation claim. Thus, granting Plaintiff all inferences, she nonetheless fails to meet the second prong of her prima facie case for retaliatory discharge.

Even if a prima facie showing of retaliation has been made, the burden shifts to Defendant to show that the plaintiff was discharged for another, non-pretextual reason. In this case, as the Court has discussed at length, Defendant has demonstrated that Plaintiff was terminated in conjunction with the PBC 3x3, as a result of her consistently inadequate job performance, and Plaintiff has failed to show that this reason was a pretext for discrimination or retaliation. See Part V.A., supra. Accordingly, the Court grants Defendant's Motion with respect to Plaintiff's claim of retaliation under the Worker's Compensation Law.

## H.     Plaintiff's Privacy Violation Claim

Plaintiff alleges that IBM "violated [her] rights of privacy by releasing of personal documents to a third party without prior permission and/or consent." Compl. Form A, § 1, para. 9. Specifically, Plaintiff claims that IBM violated her privacy by producing documents related to her employment at IBM to her husband's attorneys in response to a subpoena issued by the court in her divorce action. Pl. Dep. 307:6-23. In February 2005, the attorneys for Ms. O'Brien's husband served IBM with a subpoena duces tecum to produce documents pertaining to Plaintiff's employment at IBM. Plaintiff argues that the subpoena was defective because discovery had

closed in the case and the subpoena was copied to her former attorney who was no longer representing Plaintiff at the time.[65]  She contends that IBM should have verified the validity of the subpoena, that it disclosed documents that exceeded the scope of the subpoena, produced factually inaccurate information, and did not obtain her consent to the release of documents or copy her on its response to her husband's attorney.  See Pl. Opp. at 39-40.  As support for her claim, Plaintiff cites Crescenzo v. Crane, 350 N.J. Super. 531 (App. Div. 2002).

Plaintiff's reliance on Crescanzo is misplaced, as that case involved a plaintiff's physician who provided privileged medical records to her husband's divorce counsel in response to an invalid subpoena and without consent from or notice to the plaintiff or her attorney.  In that case, the court determined that the types of medical records turned over were subject to a physician-patient privilege and that the physcian had an independent legal and ethical duty to maintain the confidentiality of the records.  Crescenzo, 350 N.J. Super. at 541-42.  The court stated that in such instances a determination as to the piercing of this privilege must be made in a courtroom by a judge.  Id. at 543.  The causes of action maintained against the physician was on the grounds of breach of confidentiality, violation of physician-patient privilege, medical malpractice, intentional infliction of emotional distress and negligent infliction of emotional distress – not invasion of privacy, as Ms. O'Brien alleges here.

Ms. O'Brien's case is very different from Crescenzo, as it does not involve physician-patient privilege or some other legally cognizable confidential relationship.  Plaintiff's records

---

[65]Plaintiff fails to explain why her remedy for the defective subpoena was not in her divorce action and before the judge overseeing that case, as opposed to collaterally attacking it here.

were not subject to any non-disclosure privilege and IBM had no legal duty to obtain Plaintiff's consent before producing the documents pursuant to a subpoena. Moreover, Plaintiff provides no evidence to support her contentions with regard to the state court discovery period, the validity of the subpoena, the scope of the documents produced or the status of her counsel at the time of the subpoena. Thus, Plaintiff's unsupported conclusory allegations are insufficient to survive a motion for summary judgment and this claim is dismissed.

## VI.    CONCLUSION

For the forgoing reasons, Defendant's Motions for Summary Judgment on all claims is granted, and Plaintiff's Motion pursuant to 56(f) is denied. Plaintiff's motions in limine are denied.

/s/ Freda L. Wolfson
The Honorable Freda L. Wolfson
United States District Judge

Date: March 27, 2009

78